BLANTON WINSHIP, GOBERNADOR DE PUERTO RICO, querellante y apelante, *v.* ASAMBLEA MUNICIPAL DE MANATÍ, apelada.

Núm. 8.—*Sometido:* Enero 9, 1939. *Resuelto:* Julio 29, 1939.

*Hon. Procurador General B. Fernández García, Jesús A. González, Procurador General Auxiliar* y *Enrique Córdova Díaz, Subprocurador General Auxiliar,* abogados del apelante; *C. Iriarte, F. Fernández Cuyar* y *H. González Blanes,* abogados del Alcalde residenciado.

EL JUEZ ASOCIADO SEÑOR HUTCHISON emitió la opinión del tribunal.

La Asamblea Municipal de Manatí en un procedimiento de *impeachment* (residencia) exoneró al Alcalde en la teoría de que cincuenta y seis cargos formulados y sometidos por el Gobernador de Puerto Rico no habían sido probados más allá de una duda razonable.

Los primeros seis cargos fueron substancialmente, que el Alcalde, luego de recaudar fondos para la compra de mangas para incendio y para la reparación de bocas de riego, se había apropiado los mismos y los había dedicado a otros fines, sin haberlos depositado en la tesorería municipal.

En el primer cargo se mencionaba un cheque recibido de Jaime Calaf el 17 de diciembre de 1937. En una investigación preliminar Calaf manifestó que este cheque representaba un donativo para la compra de mangas para incendio. En el curso del procedimiento de *impeachment,* este testigo declaró que ese donativo lo había hecho para la reparación de calles y que otro cheque fechado el 13 de mayo lo había expedido para la compra de mangas para incendio. El cheque de diciembre 17 no fué depositado en la tesorería municipal. Estaba endosado por el Alcalde y había sido entregado por éste a Eliseo Martínez en pago de ciertas herramientas utilizadas en la reparación de las calles. El cheque fué hecho efectivo por el tesorero a instancias de Martínez, quien no lo endosó, mas recibió el importe.

En el segundo cargo se especificaba un cheque por la suma de $75, suscrito por Víctor García. Este cheque representaba un donativo de $50 por parte de García y otro de $25 de Ramón Menéndez. García era una de las personas que formaban la comisión que visitó la mayoría de las compañías de seguro en San Juan en solicitud de contribuciones para la compra de mangas para incendio y la reparación de bocas de riego. El Alcalde también formaba parte de esta comisión. Ambos donativos fueron hechos para el fin indicado. El Alcalde manifestó a Menéndez que tenía el propósito de utilizar cualquier sobrante para el sostenimiento del hospital municipal. Dos semanas más tarde le manifestó a García que no tenían fondos para el hospital y le preguntó si se oponía a que los fondos recaudados se usaran para dar comida a los enfermos. García le contestó que hiciera lo que él quisiera. El cheque de $75 nunca fué depositado en la tesorería municipal. El Alcalde depositó el 24 de junio de 1937 las sumas de $114.64 y de $91.57, y en junio 30 la de $99.30. En un certificado expedido por el tesorero municipal, las primeras dos sumas figuraban como depositadas para la reparación de calles y la tercera para el sostenimiento del hospital. El tesorero declaró que el Alcalde le había entregado el dinero

manifestándole que lo habían recaudado. Al tiempo de hacerse esa declaración los libros del tesorero no contenían ninguna partida que pudiera ser identificada por él como representativa de uno o más donativos para mangas o bocas de riego para incendio.

En el tercer cargo se mencionaba la suma de $10 recibida de Manuel San Juan en marzo 31, 1937. El tesorero municipal cobró un cheque por esta suma pagadero a la orden del Alcalde y presentado por él. Ni el cheque ni el dinero recibido por el Alcalde del tesorero fueron depositados en la tesorería municipal para aquel entonces. Más tarde el Alcalde depositó las sumas mayores ya mencionadas. El último de estos depósitos iba acompañado de una relación de los donantes. El nombre de San Juan no figuraba en esa relación.

En el cuarto cargo se especificaba la suma de $20 recibida de A. Trigo & Cía. el 26 de abril de 1937. El cheque fué recibido por García y entregado por éste al Alcalde. Era pagadero a García o a su orden, estaba endosado por él, por Orestes Ramos y por el Aquarium Bar Co. para depositarse a la cuenta de este último.

En el quinto cargo se especificaba la suma de $10, recibida de Albert E. Lee & Son, Inc., en abril 26, 1937. El sexto mencionaba la suma de $5, recibida de Adolph Steffens el 30 de abril de 1937. Ambos cheques eran pagaderos a García o a su orden. Ambos fueron endosados por García y por el Alcalde y depositados por este último en su cuenta en el National City Bank en julio 30 de 1937.

Como testigo de la defensa declaró Arsenio Carreras, Tesorero y Director Escolar, en la siguiente forma: recibió en junio 24 de 1937 un donativo de $114.64; otro de $91.57, y en junio 30 otro de $99.30, o sea un total de $245.21. Todo el dinero estaba en efectivo, no había cheques. Recibió esa suma del Alcalde en persona. El Alcalde le indicó la forma en que. deseaba se utilizaran estos donativos. No mencionó los nombres de los donantes.

En la repregunta declaró: los $114.64 fueron deposita-
dos para reparar las calles. El testigo no sabía quiénes eran
los donantes; la relación no le fué entregada. Había sido la
costumbre invariable, de conformidad con las reglas y regla-
mentos de auditoría, consignar los nombres de los donantes.

En el examen redirecto este testigo manifestó que los
$114.64 fueron para la limpieza de calles; los $91.57 para
reparación de las mismas y la de $99.30 para sostenimiento
del hospital. Al ser repreguntado nuevamente, manifestó
que los $114.64 fueron entregados por el Alcalde como dona-
tivo para la limpieza de calles. Esa suma no era el sobrante
de ningún donativo para mangas y bocas de riego para incen-
dio, depositada de conformidad con una resolución aprobada
por la Junta Administrativa. El asiento original de los
$114.64 figuraba para la limpieza de calles; dicha suma se
utilizó para ese fin. Los $91.57, que figuraban como donativo
para la reparación de calles, no eran el sobrante de ningún
donativo hecho al municipio para la compra de mangas y
bocas de riego para incendio. Los $91.57 no fueron depo-
sitados en las arcas municipales a virtud de ninguna reso-
lución de la Junta Administrativa como sobrante de ningún
donativo para la compra de mangas para incendio. Los $99.30
depositados para el sostenimiento del hospital municipal no
eran el sobrante de ningún donativo hecho al municipio para
la compra de mangas y bocas de riego para incendio. Los
$99.30 no ingresaron en las arcas municipales a virtud de
ninguna resolución de la Junta Administrativa como sobrante
de ningún donativo para la compra de mangas o bocas de riego
para incendio. El donativo de $99.30 no ingresó en la teso-
rería municipal como sobrante de ningún donativo para la
compra de mangas o bocas de riego para incendio, a virtud
de ninguna resolución de la Junta Administrativa. El Alcalde
le entregó al testigo, con fecha 26 de febrero de 1938, una
relación de los donantes que contribuyeron para este último
donativo de $95. Esto fué después de haberse iniciado la
investigación. El investigador García González había llegado

el día 2. El testigo no tenía una relación de los donantes que habían contribuído para los $114.64, para los $91.57 ni para los $99.30.

En un nuevo examen redirecto manifestó que el dinero fué utilizado para fines legítimos municipales y que el Alcalde no se apropió del mismo; que fué utilizado para los fines indicados.

Mamerto Vigo, mecánico, identificó una factura fechada el 20 de junio de 1937 por la suma de $48 por la reparación de seis bocas de riego para incendio. La factura representaba trabajo hecho por él para el municipio. Fué pagada por Virgilio Ramos en efectivo. El testigo se había negado a hacer el trabajo para el municipio y el Alcalde le manifestó que le pagaría personalmente. El testigo exigió que se le pagara en efectivo. El Alcalde ofreció pagarle en cheques y el testigo se negó a aceptarlos. Al siguiente día la cuenta fué pagada en efectivo.

En la repregunta el testigo manifestó que: no presentó su cuenta al municipio. Le dijo al Alcalde que no haría más trabajos para el municipio; efectuó dicho trabajo a virtud de la promesa del Alcalde de pagarle personalmente. El pago se hizo el 21 de junio de 1937, o sea el día siguiente al de la factura. El Alcalde mandó a buscar las bocas de riego y el testigo se negó a entregarlas. El testigo había hecho una factura en papel carbón a nombre del Alcalde y éste le dijo que la preparara a nombre del municipio. El testigo siempre había tenido borderós. El borderó para la factura de junio 20, 1937, había sido impreso por Miranda. El testigo no recordaba la fecha. Pudo ser en febrero de 1938.

En el examen redirecto el testigo manifestó que: él no había dicho que ésta era la primera factura que le había pasado al Alcalde, él se la hizo en una libreta de papel carbón y el Alcalde no la había aceptado porque no tenía el nombre del testigo y entonces el testigo tuvo que hacerle la otra.

Al ser nuevamente repreguntado, manifestó: que había entregado al Alcalde la última factura un mes o dos antes de la fecha en que él comparecía como testigo en el procedimiento de *impeachment*. El Alcalde le llevó la otra.

En un nuevo examen redirecto manifestó que: la segunda factura se basaba en la primera y el Alcalde se quedó con ambas. La primera factura leía: ''Virgilio Ramos Muñiz,'' y él quería que dijera, ''Municipio de Manatí.'' El trabajo fué hecho para el municipio. La segunda factura era copia de la primera.

Virgilio Ramos Muñiz declaró: que era comerciante y agricultor y que desde enero 11, 1937, o sea por espacio de diez y ocho meses había sido Alcalde de Manatí. Que a la Asamblea Municipal no la dejaron tomar posesión. Que ésta entró en funciones por primera vez hace unos dos meses. Durante unos diez y seis meses el testigo trabajó sin Asamblea Municipal. Durante los meses de marzo a junio 1937 el testigo efectuó colectas. La mayoría de las veces iba solo; a veces acompañado de otros. La administración saliente dejó las cosas en un estado deplorable, según ocurre con todos los partidos políticos. El testigo se vió precisado a recolectar fondos. Recibió de Víctor García un donativo de $50. Éste le dijo al testigo: ''Yiyo, te doy los $50 y cuanto tú solicites; echa *pa' alante* y no te aflojes.'' Ramón Menéndez le dió al testigo $25 por mediación de García. García los entregó al testigo para que los utilizara como el testigo quisiera y se los cargó a Menéndez. Estos dos donativos fueron incluídos en un solo cheque. No tenían relación alguna con ningún donativo para mangas o bocas de riego para incendio. El dinero recaudado para bocas de riego era distinto a los $75. El testigo cambió el cheque en la caja de su establecimiento. No había bancos en Manatí y el declarante tenía cuentas con el National City Bank y con el Banco Popular de San Juan. El testigo no recordaba qué hizo con el cheque. Había oído la declaración de los empleados de la General Motors Acceptance Corporation al efecto de que el cheque había sido entre-

gado para satisfacer un pagaré entregado en pago de un automóvil. El testigo era el fiador en la compra de dicho vehículo. No recordaba si había pagado como fiador o si lo había entregado a Antonio Vélez Alvarado. Recibió el cheque de $10 de Manuel San Juan, fué con el mismo donde el tesorero municipal y allí lo hizo efectivo. Recibió un cheque de $20 de A. Trigo & Cía. La compañía de seguros remitió dicho cheque a Víctor García y éste lo entregó al declarante en unión de otros. El cheque era pagadero a la orden de Víctor García, quien lo endosó y lo entregó al testigo para la colecta relacionada con mangas para incendio y la reparación de bocas de riego. El testigo lo cambió en la caja de su establecimiento y luego lo puso en circulación. Fué utilizado en pago de una cuenta de Orestes Ramos, quien lo cobró en el Aquarium. El importe de dicho cheque fué depositado, con el producto de otros cheques, para la reparación de bocas de riego. El declarante recibió un cheque por $10 de Albert E. Lee & Son. Este cheque era pagadero a la orden de Víctor García y vino a poder del testigo luego de haber sido endosado por García. Este cheque de $10 y otro de $5, de Adolph Steffens, más el resto en efectivo, fué dado por el declarante a Vigo por la reparación de las bocas de riego. Vigo no quería coger los cheques y el testigo entonces los cambió en la caja de su establecimiento y le pagó a Vigo en efectivo. El testigo entonces depositó los cheques con $25 adicionales a su propia cuenta en el banco. El testigo y García fueron a San Juan a recaudar dinero para la reparación de bocas de riego y la compra de mangas para incendio. Aquellas bocas de riego que aún servían fueron reparadas. Se gastaron $48 en esta forma. La colecta terminó en junio, y para aquel entonces el auditor estuvo enfermo unos quince días, y cuando el testigo efectuó el pago en efectivo no había auditor a quien entregar el dinero, y el testigo entonces le pagó a Vigo de contado. Vigo le dió al declarante un recibo a nombre de Virgilio Ramos Muñiz. Unos meses más tarde el testigo fué donde Vigo y le pidió otro recibo que pudiera ser presentado

legalmente por él al serle requerido. El declarante pagó a Vigo en billetes el 21 de junio de 1937. Utilizó los $75, importe del cheque de García, para pagar las comidas usadas en el hospital—$292.50, por los alimentos así consumidos. Cuando el testigo se hizo cargo del municipio, esa partida del presupuesto estaba sobregirada en la cantidad de $10.90. De enero a junio de 1937 se sostuvo esa partida pidiendo el testigo por las calles como un mendigo. De su propio bolsillo efectuó un pago de $99 a la cuenta del hospital. Desde que se efectuó ese pago hasta el mes de junio, no se hizo ningún otro porque no había dinero con que hacerlo. Los $90 (sic) fueron pagados en parte con dinero recolectado por el testigo y en parte con dinero de su propio peculio. Los $290.50 pagados en junio se abonaron a la cuenta de arroz y habichuelas del hospital. El dueño de la tienda era Alberto Montes. Los $75 recibidos de Víctor García estaban incluídos en esta suma. Visitó a otras personas y les pidió que contribuyeran para el sostenimiento del hospital. Los donativos recibidos de marzo a junio de 1937 ascendieron a $351.50. Éstos incluían los recibidos de Albert Lee, Steffens, Manuel San Juan y Trigo. De estos donativos, $290.50 fueron utilizados en la compra de arroz y habichuelas y $48 en el pago efectuado a Vigo. El testigo pagó a Alberto Montes los $290.50 al día siguiente de recibirse una carta. La comisión que fué a San Juan a recaudar dinero para las bocas de riego se componía del testigo, de Víctor García y de Teodomiro Taboas. No se especificó el fin para el cual se dió el cheque de García. Los $48 fueron pagados del producto de los cheques recibidos en San Juan para la reparación de bocas de riego. Había un sobrante de $61. Este sobrante, con el producto de otra colecta, fué utilizado en el cumplimiento de una obligación asumida por el testigo con la P.R.R.A. para el suministro de ciertos materiales para la construcción de tres calles en que se había suspendido el trabajo, pero ésa fué otra colecta. El testigo había ordenado las mangas para incendio de buena fe a la Goodyear, mas no pagó por las

mangas porque si no hubiera pagado la cuenta de la tienda, no habría tenido provisiones para el hospital en primero de julio. El testigo ordenó las mangas después de efectuar la colecta el día que fué a San Juan con García. La orden fué cancelada porque no había dinero. Los $390 no fueron depositados en la tesorería municipal porque cuando el testigo terminó la colecta, el auditor estaba enfermo. El testigo no hubiera podido depositar esa suma aun si lo hubiera deseado, porque el auditor estaba enfermo. Entonces se recibió una carta de Alberto Montes y el auditor aún permanecía en cama. La contribución de $114 nada tenía que ver con la colecta de $390. Ése era el tanto por ciento del Partido. El testigo había pedido ese dinero al Partido para que no le armaran una huelga los trabajadores. Hacía dos semanas que no se pagaba a los peones y no podía permitirse que la situación continuara. A fin de pagar a los trabajadores y de hacer frente a otras obligaciones, el testigo tuvo que mendigar por las calles. No era que el testigo deseara reparar las calles; éstas habían quedado en pésimas condiciones y no podían repararse con unas cuantas piedras. No había dinero en tesorería para ese fin. Los $114 eran una contribución del Partido, un tanto por ciento contribuído por los empleados municipales. Las otras partidas de $91 y $99 fueron solicitadas por el testigo.

Durante la repregunta:

Cuando el testigo se hizo cargo del municipio halló que había $900 en caja para seis meses. De un presupuesto de $83,000, necesitaba $42,000 para los seis meses y sólo tenía $900. Tenía que buscar $39,000 para atender a la administración durante seis meses. Un donativo hecho en febrero 2 de 1937 por Gabriel Martínez para la reparación de calles fué más o menos un donativo involuntario sacádole al donante por el testigo. Un donativo recibido de Jaime Calaf fué hecho para la reparación de la calle Celis Aguilera. Los $114.64 fueron considerados por el testigo como provenientes directamente de los fondos del Partido. Los $114.64 ó los $91.57

fueron recibidos por el declarante de la dirección del Partido. El testigo no recordaba respecto a la otra suma. Una suma para la limpieza pública salió del Partido y otra para reparación de calles también salió del Partido. Las sumas utilizadas para el sostenimiento del hospital salían de los fondos recaudados por el testigo. Una partida de $95, de febrero 26, 1938, para el sostenimiento del hospital, fué solicitada por el declarante. Al terminarse la colecta para las mangas de incendio y para la reparación de bocas de riego, no había auditor en el municipio. Había un tesorero. El auditor estuvo enfermo a fines de junio de 1937. El testigo creyó que era innecesario depositar los cheques antes de terminar la colecta. No depositó el dinero en la tesorería municipal. El declarante sirvió de fiador en la compra del automóvil. No recordaba si había traspasado el cheque de $75 de García en pago del carro o como préstamo dado a Antonio Vélez Alvarado. Tampoco recordaba la fecha. Fué entre mayo primero y mayo trece. El dinero que el testigo sacó de la caja de su establecimiento lo guardó en un archivo de acero en la oficina del Alcalde. Lo utilizó para cosas del municipio a fines de junio de 1937. Había recaudado $351.50. Los $75 estaban incluídos en los $351.50 que el testigo había recaudado en cheques y en efectivo. Fueron gastados como parte de los $351.50. La partida menor era la de $48, utilizada para la reparación de bocas de riego; la mayor, la de $290.50, pagada a la tienda, y el saldo de $61 fué unido a otra colecta para la compra de herramientas prometidas a la P.R.R.A. En junio 20 se pagaron $48 a Vigo; en junio 30 ó julio 1, $290.50 a Alberto Montes, y los $61 restantes fueron agregados a la colecta para la P.R.R.A. y utilizados en la compra de herramientas prometidas a la P.R.R.A. Las herramientas ascendían a $206. El cheque de $10 entregado al testigo por Manuel San Juan fué entregado por el declarante al Tesorero Municipal, de quien recibió $10 en efectivo. El testigo guardó estos $10 en el archivo de acero con el otro dinero que tenía allí. Las cuentas municipales estaban sobregiradas. Si se hubiera

depositado el dinero, se habría perdido. Había certificados pendientes de pago. Si el dinero se hubiera depositado en un fondo especial, no se le habría podido utilizar según se le necesitaba. Las necesidades eran numerosas y el dinero fué gastado en las necesidades más urgentes, ya se le hubiese recaudado para dicho fin o para cualquier otro. El testigo cambió el cheque de $10 recibido de Albert E. Lee & Son en una caja de seguridad junto con el otro cheque de $5 recibido de Steffens, luego de haberse negado Vigo a aceptar estos cheques en pago parcial de las reparaciones de las bocas de riego. El testigo retuvo el cheque de Lee durante tres meses, o sea durante abril, mayo y junio. El cheque de $20 fechado el 20 de abril de 1937, pagadero a la orden de García, suscrito por A. Trigo & Cía. y pagado por el Banco el 22 de julio, también estuvo en poder del testigo por espacio de dos o tres meses. El declarante lo cambió en su caja de seguridad y guardó los $20 en su archivo. Luego puso esta suma en circulación en el curso de sus transacciones comerciales con Orestes. El auditor estuvo enfermo desde el 15 de junio hasta el primero de julio. El auditor era el secretario del Alcalde y en quien él tenía gran confianza. Necesitaba consultarle. Si el Alcalde hubiera depositado el dinero como donativo, ese dinero no se habría podido transferir más tarde por falta de una Asamblea Municipal. Podía ser que el auditor, durante los últimos días de su enfermedad hubiera estado en su oficina en ciertas ocasiones. Puede ser que el Auditor a veces asistiera a su trabajo y que en esos momentos el Alcalde estuviera ausente. El cheque de Víctor García por $75, el de Lee por $10, etc., no fueron incluídos en los donativos de $114, de 24 de junio de 1937, de $91.57, de junio 24, y de $99, de junio 30 del mismo año. Cuando el testigo terminó su colecta a fines de junio, el Auditor estaba enfermo.

En el examen redirecto este testigo declaró:

Los donativos que figuraban como depositados en 20, 24, y 30 de junio por $114, $91 y $99, fueron depositados en

la tesorería municipal para esos fines; si hubiera habido Asamblea tal vez se hubieran cambiado; los gastos correspondientes se hacían de esas partidas. Había una partida en el presupuesto para la reparación de bocas de riego; en junio de 1937 estaba sobregirada. Si el dinero recaudado para la reparación de bocas de riego se hubiera depositado como un fondo para ese fin, hubiera sido necesario hacer frente al sobregiro; o el dinero se hubiera utilizado en el pago de los certificados pendientes, que no podían ser pagados de otros fondos; si el testigo hubiera depositado el dinero, sus hechos se hubieran ido al suelo. Cuando el testigo se hizo cargo, la cuenta de hospital estaba sobregirada en la suma de $6.69. Aún permanecía sobregirada en junio 30. Si el testigo hubiera hecho el depósito, el resultado hubiera sido el mismo. Todo el dinero se había utilizado para fines del municipio; si se hubiera dispuesto de más dinero, el testigo lo hubiera gastado.

Alberto Montes declaró:

Que había suministrado provisiones para el hospital municipal. En una carta de junio 30, 1937, el testigo informó al Alcalde que a menos que se pagara la cuenta no podría continuar suministrándole provisiones. El municipio le debía para aquel entonces $357.45 por concepto de provisiones suministradas al hospital municipal durante los meses de abril, mayo y junio. En julio 1, el Alcalde le había abonado en efectivo $290.50.

En la repregunta este testigo manifestó:

Que tenía un capital de $1,500 más o menos. Que hacía negocios a crédito. Con fecha 30 de junio rindió una cuenta al municipio. Había enviado cuentas mensuales al municipio. Los $357.45 corresponden a los meses de abril, mayo y junio. No recordaba la cantidad correspondiente al mes de abril, pero había enviado la cuenta. La carta fué escrita el 30 de junio, no después. El testigo había enviado las cuentas mensuales. Las órdenes habían procedido del hospital. Habían sido redactadas por la Superintendente y no por el Director de Beneficencia. No recibía órdenes del municipio sino sola-

mente de la Superintendente, pero creía que las mismas habían sido firmadas por el Alcalde. Las órdenes eran enviadas por la Superintendente. El testigo no tenía órdenes del Director de Beneficencia; ninguna orden estaba suscrita por el Director de Beneficencia. El Alcalde en persona había pagado $280 al testigo en junio 30. La deuda ascendía a $357.45 para aquel entonces. Había rendido cuentas mensuales. El testigo había retenido las notas en su establecimiento y enviado una cuenta a fines de cada mes, e incluído las órdenes. Envió 28 facturas correspondientes al mes de marzo de 1937 al municipio con un estado de cuenta. No recuerda si las había firmado o no. Acostumbraban remitir al testigo la nota del hospital y él las copiaba por triplicado en un libro; guardaba el triplicado y a fines de mes ponía: "Según nota, $2.76; marzo 2, marzo 3." La cuenta correspondiente al mes de marzo había sido pagada por el Auditor. El testigo había preparado 33 facturas correspondientes al mes de abril y otras correspondientes a los meses de mayo y junio. Nunca había retirado las cuentas enviadas por él al municipio. El testigo había remitido en 30 de junio una cuenta al municipio por $357.45. El municipio nunca le había pagado el saldo de esta cuenta.

En el examen redirecto el testigo dijo:

Como el municipio venía pagando regularmente desde el primero de julio, el saldo, o sea la diferencia entre $357 y $290, aún se hallaba pendiente de pago. El testigo había tratado de cobrar, pero aún se le adeudaba el saldo.

Alberto Montes, llamado a declarar en refutación, luego de identificar un diario y un mayor como los libros llevados por él, manifestó:

El diario lo había utilizado para los asientos diarios, más a veces estos asientos habían sido llevados directamente al mayor. El asiento de los $290.50 fué hecho directamente en el mayor. Esa partida no fué llevada al libro diario. El saldo correspondiente al 30 de junio de 1937 ascendía a $457.25. Los $290 se acreditaron con fecha primero de julio de 1937. El saldo llevado a la otra página ascendía a $166.75.

El saldo de $457.25 figuraba en la página 88 del libro mayor. Los $290 habían sido acreditados en esa página. El saldo era $166.75. Ese saldo fué pasado a la página 99. Había habido un error en la fecha del asiento. Había una borradura en la página 99. Aparecía con fecha primero de julio. El testigo había cometido un error. El saldo había sido pasado a la otra página con fecha 1 de julio. Existía otro ligero error. Aparecía con fecha 19, pero debía ser julio 1. Entonces el testigo había recibido un cheque por $99.30 del municipio con fecha 20 de julio, lo que dejaba un saldo en descubierto de $67.45. La fecha 19 estaba equivocada. Puede que fuera un error que todos los números posteriores al saldo de $166.75 aparecieran borrados en la página 99 y que se hubiesen escrito nuevos números. El testigo no tenía líquido alguno. Las borraduras de los asientos 1 al 20 que aparecían en la columna de balance en la página 99 deben haberse hecho con una goma.

Repreguntado, el testigo manifestó:

Que no había estudiado contabilidad; que tampoco había tenido experiencia en contabilidad. Había muchos otros errores en el mismo libro mayor. El testigo había cometido frecuentes equivocaciones; había otras borraduras; el testigo había llegado hasta el quinto grado de escuela elemental. Toda vez que el testigo se había visto precisado a borrar al principio, se había hecho necesario borrar todos los números; todos los números tuvieron que ser alterados. Los $290 habían sido pagados por el Alcalde; al testigo no se le había obligado a llevar libros; tenía su negocio solo; cuando el testigo cometía una equivocación en sus libros creía estar en libertad para corregirlos.

Al pedírsele en el examen redirecto que encontrara otras borraduras en el libro mayor, el testigo se dirigió a la página 12 y señaló un asiento hecho con fecha 18 de mayo. Al pedírsele que buscara otra página en adición a la 99 en que se hubiera borrado en vez de tacharse algo, el testigo guardó silencio; al repetírsele la pregunta, el testigo se refirió a la cuenta de Francisco R. Silva. Al llamársele la atención hacia

el hecho de que ésa no era una borradura contestó que eso estaba tachado. Al pedírsele que examinara el libro mayor página por página en busca de otra borradura similar a la de la página 99, el testigo contestó que con lápiz no había ninguna. Había varias ocasiones en que un número estaba tachado y otro puesto en su lugar. Al preguntársele cuál había sido su costumbre normal al cometer un error en el libro mayor, el testigo contestó: ''Tacho o borro.'' Al preguntársele por qué, no obstante esa práctica, sólo había una borradura y muchas tachaduras, contestó que la cuenta municipal era la mayor que él llevaba. No sabía si en todo el resto del libro había o no otras borraduras.

En un nuevo examen redirecto el testigo manifestó:

Que había examinado el libro mayor página por página para averiguar si había o no otras borraduras semejantes a la de la página 99 y que no había encontrado ninguna.

En un nuevo examen de repregunta:

La borradura en la página 99 era en una sola columna. El libro tenía tres columnas: *debe, haber y balances.* Al entrar los $166.75 el testigo los había llevado a la columna del *debe.* De no haberse borrado los números en la página 99, de no habérseles corregido, la cuenta no hubiese dado el balance. Se había hecho necesario hacer la corrección debido al traspaso de la partida de la columna del *debe* a la del *balance.*

En un nuevo examen redirecto:

El testigo no recordaba cuándo había notado la equivocación que hizo necesarias las borraduras en la página 99. Había un error en la primera entrada de los $166.75. Tenían que figurar en la columna del *debe.* Entonces el testigo empezó a borrar para que apareciera bien el balance. La última borradura en la página 99 era la partida de marzo 31, 1938. El testigo no recuerda si había notado el error después del primero de marzo (*sic*) de 1938.

Tenemos ante nos copias fotostáticas de las páginas 88 y 99 del libro mayor. La primera entrada que figura en la

página 99 está fechada el 19 de julio. El "9" del "19" aparece puesto sobre otro número. La partida aparece como traída de la página 88 y figura en la columna de balances con la suma de $166.75. La copia fotostática revela claramente que se había efectuado una borradura antes de que los $166.75 fueran escritos por primera vez y luego se tacharan. El segundo asiento también está fechado el 19 de julio. El "19" aparece escrito sobre un número "2" o sobre un número que contiene esa cifra. En la columna del "debe" aparecen $166.46. En la misma línea figura la misma cantidad en la columna del balance. Aparece escrita sobre una borradura. El siguiente asiento que lleva fecha 20 de julio muestra un abono de $99.30 y el saldo de $67.45. Los $67.45 aparecen escritos sobre una borradura. Todos los demás balances hasta el 31 de marzo aparecen escritos sobre borraduras. Evidentemente el error en el primer asiento o en el segundo—de ser un error—no fué descubierto antes del 31 de marzo de 1938. De lo contrario no hubiera sido necesario borrar y corregir el saldo de esa fecha. Asumiendo para los fines de la argumentación, que se hubiera cometido un error en el primer asiento o en el segundo, la necesidad de borrar y de escribir de nuevo todos los balances posteriores hasta el 31 de marzo no es muy clara. En enero 31 se notó un error de 3 centavos y dichos 3 centavos fueron abonados al municipio sin necesidad de que se hiciera ninguna borradura o alteración. No vemos razón alguna para que no se siguiera el mismo procedimiento en marzo 31, anotando simplemente el error en el primer asiento o en el segundo y corrigiendo el balance por medio de una simple operación aritmética. Sea ello como fuere, de haber sido necesario hacer alteraciones en todos los saldos desde el 1 de julio de 1937 hasta el 31 de marzo, 1938, con el propósito de corregir una equivocación cometida de buena fe, el tachar los antiguos saldos en vez de borrarlos antes de escribir de nuevo, hubiera sido un procedimiento mucho más simple y más fácil, especialmente para Montes que tenía por costumbre seguir ese método. Su aban-

dono repentino de su práctica anterior de cruzar errores y su adopción del método más laborioso de borrar y escribir de nuevo unos veinte saldos, es algo que permanece inexplicado. Su tentativa de explicar las borraduras fué un fracaso rotundo. No explicó por qué había sido necesario borrar la primera partida en la columna del balance antes de escribir el balance de $166.75 traído de la página 88 después de haber efectuado en dicha página el abono de los $290.50.

La investigación que dió lugar al procedimiento de *"impeachment"* fué iniciada en Manatí el 29 de marzo de 1938. El investigador sostuvo una entrevista con el Alcalde en la tarde del 30 de marzo. La cuenta que figuraba en la página 88 del libro mayor de Montes cubría solamente la primera mitad de dicha página. Si el abono de $290.50 no se hubiera hecho el primero de julio, 1937, y si el Alcalde en marzo 31, 1938, hubiera deseado efectuar tal asiento con el consentimiento y la cooperación de Montes, nada había en la página 88 que se lo impidiera. La explicación lógica de las borraduras y de las alteraciones que figuran en la página 99, parecería ser que el último asiento en la página 88 no fué hecho en julio 1, 1937, sino en 31 de marzo, 1938.

El recibo que se ofreció como prueba en apoyo de la alegación de que se habían pagado $48 a Vigo con fecha 20 de junio, 1937, fué igualmente un pensamiento posterior antedatado. El Alcalde consiguió el recibo después de iniciada la investigación, poco antes de la vista del *"impeachment"* y más de un año después del día en que se efectuó el supuesto pago. Esta admisión se le extrajo a Vigo durante el examen de repregunta. No se demostró que el primer recibo se hubiera perdido. Por el contrario, según Vigo, estaba en poder del Alcalde al obtener éste el segundo recibo uno o dos meses antes de la vista. No fué ofrecido como prueba.

Dado el criterio que formamos del caso y dada la conclusión a que llegó la Asamblea Municipal, podría admitirse, para los fines de esta opinión, que el Alcalde le pagó a Vigo la suma de $48, bien allá para el 20 de junio de 1937 o por

lo menos un mes o más antes del 16 de agosto de 1938. Podría admitirse que le pagó a Montes la suma de $290.50 allá para el 31 de marzo de 1938. Podría admitirse que una suma equivalente a la del cheque de García por $75—con que el Alcalde, unos meses antes había pagado una obligación personal—fué incluída en los $290.50. Podría admitirse que el producto de otros cheques representativos de donaciones para mangas y bocas de riego para incendio fué incluído en los $290.50. En su consecuencia, aún podría admitirse, sin resolverlo, que, con intención de defraudar al municipio, él no se adueñó definitivamente para su propio uso ninguna parte del dinero donado para la compra de mangas de incendio y para la reparación de bocas de riego.

El Alcalde era un comerciante. El volumen mensual de sus negocios ascendía a no menos de $2,000. Tenía dos cuentas bancarias, una en el National City Bank y otra en el Banco Popular. La objeción de Mamerto Vigo a recibir cheques fácilmente pudo ser afrontada. Difícilmente podría concebirse que no pudo habérsele inducido a aceptar un cheque personal del Alcalde, si por ejemplo, éste se hubiera ofrecido a acompañarle hasta la oficina del Tesorero Municipal para ver que el cheque le fuera pagado. El Alcalde no había tenido dificultad alguna al hacer efectivos otros cheques en igual forma, incluyendo uno de los de Calaf por $100. De los autos no aparece que Montes tuviera objeción alguna que hacer a los cheques y si en realidad se le pagó el primero de julio de 1937, no había razón alguna por la cual no se le pagara mediante cheque—esto, sin mencionar las razones obvias por las cuales debió habérsele pagado en esa forma.

Ninguna parte del dinero recaudado para la compra de mangas para incendio y para la reparación de bocas de riego, fué jamás depositada en las arcas municipales conforme exige el Reglamento. Si el supuesto pago de la suma de $48 a Vigo fué una transacción *bona fide,* nada había que impidiera que se hiciera un depósito en un fondo especial ni la expedición de un libramiento por el Auditor ni de un cheque

por el tesorero municipal, que Vigo pudo haber hecho efectivo en la tesorería municipal o en el establecimiento del Alcalde. Igual procedimiento pudo haberse seguido en relación con los $290.50 a pesar del sobregiro de $6.69 en la cuenta del hospital.

El Alcalde tenía conocimiento del deber impuéstole por el reglamento, según demuestran sus depósitos de $114.64 y $91.57 en junio 24, o junio 20 y 24 de 1937, y de $99.30 en junio 30. El sobregiro de $6.69 en la cuenta del hospital no impedía que se depositaran $99.30 para el sostenimiento de dicha institución. La enfermedad del Auditor durante la segunda quincena del mes de junio no impedía que el Alcalde efectuara estos depósitos. Su manifestación de que "no pudo depositar" el dinero recaudado para mangas de incendio y bocas de riego, "aunque hubiese querido por que el Auditor estaba enfermo" es significativa. No depositó el dinero porque no quiso.

El séptimo cargo era que el Alcalde con la intención de defraudar al municipio había hecho preparar y preparado, presentar y presentado, al auditor, y al tesorero municipal, respectivamente, para su aceptación y pago, una cuenta a nombre de José María Valentín por doscientos sacos de carbón vegetal, ascendente a $52, a sabiendas de que dicha cuenta era falsa y fraudulenta, y había recibido del tesorero municipal $52 que se apropió para su beneficio, defraudando así al municipio.

El Alcalde había certificado que la cuenta era correcta, legal y pagadera a Valentín; había aprobado la cuenta para su pago. El auditor municipal la había examinado y hallado correcta. Lo que pretendía ser el nombre y la marca de José María Valentín, fueron puestos por Eduardo Hernández a un recibo de pago. Eduardo Hernández era el portero, mensajero y agente confidencial del Alcalde. También había firmado como testigo de algo que pretendía ser la firma de Valentín. Un cheque expedido por el tesorero municipal a la orden de Valentín y endosado aparentemente por éste, fué

endosado por Orestes Ramos y pagado por un banco en San Juan. Valentín no había vendido ningún carbón al municipio; no había hecho constar que había recibido el importe de la cuenta, ni había endosado el cheque. Tampoco había recibido su importe.

La prueba de la defensa tendió a demostrar que el Alcalde había hablado con Valentín con el propósito de conseguir de éste el carbón. Valentín no tenía carbón, pero había convenido en ver a un señor de apellido Howe, de quien a su juicio podía conseguirse el producto si se le pagaba en efectivo. No vió al Sr. Howe. El Alcalde, anticipando que era necesario efectuar el pago al recibir la entrega del carbón, había ordenado la preparación inmediata de los documentos necesarios. También hubo prueba de la defensa tendiente a demostrar: que unos días más tarde José Torres Andino hizo un esfuerzo infructuoso para encontrar a Valentín en Vega Baja donde éste vivía, y prácticamente había comprado el carbón a Howe y endosado el nombre de Valentín en el cheque del tesorero, cuando se presentó en la escena de los hechos un individuo no identificado y manifestó que el carbón ya estaba vendido; que el carbón había sido comprado para Orestes Ramos y que el cheque con el endoso falsificado le había sido entregado en pago. El conductor del camión que acompañaba a Torres declaró que ellos no habían encontrado al Sr. Howe, pero que habían hablado con un capataz. Ni el Sr. Howe ni el capataz fueron llamados como testigos.

Torres Andino declaró que había ido al hospital con un niñito enfermo, y que la Superintendente del hospital le había mandado en busca del carbón. Él no halló a Valentín pero supo por un "jíbaro" que Valentín le compraba carbón al Sr. Howe. Entonces *fueron* donde el señor Howe a preguntarle si él vendía carbón y *dijeron* que sí. El testigo tenía el cheque y lo endosó para comprar el carbón. Entonces apareció alguien y dijo que el carbón no se vendía porque ya estaba vendido. Regresaron a Manatí, y en la curva de Gan-

día había un jíbaro con aspecto sucio que parecía que trabajaba con carbón. El testigo le preguntó si "vendían" carbón y dijo que sí.

. La inferencia obvia es que a no ser por los dos jíbaros y la precisión en los informes suministrados por cada uno de ellos, el curso posterior de los acontecimientos hubiera sido muy distinto. El conductor del camión que acompañaba a Torres Andino no presenció el endoso del cheque.

Orestes Ramos declaró que el cheque no fué endosado en su presencia sino que lo fué antes de serle entregado. Si Howe o su capataz hubieran aceptado el cheque con el endoso hecho en la forma descrita por Torres Andino, si no se hubiera frustrado la venta por la información al efecto de que el carbón ya estaba vendido—o si Orestes Ramos hubiera aceptado el cheque al ser endosado en su presencia por Torres Andino—es algo que los autos no revelan. De todos modos —si es que debemos creer la declaración de Torres Andino— la transacción con Orestes Ramos fué un incidente puramente fortuito.

La superintendente del hospital declaró sobre otros puntos relacionados con el incidente del carbón, mas no se le preguntó ni dijo si ella había enviado o no a Torres Andino a Vega Baja o a cualquier otro sitio en busca del carbón.

El conductor del camión declaró que el Alcalde había enviado a Eduardo Hernández a buscar unos doscientos sacos de carbón. Hernández habló con el testigo y éste fué con Torres Andino a buscar el carbón.

Eduardo Hernández no fué llamado a declarar por la defensa en relación con el séptimo cargo. La médula de su declaración se inserta inmediatamente debido a la importancia que tiene sobre la teoría de la defensa. Este testigo declaró:

Que el Alcalde le había ordenado que procurara el cheque en el municipio. El testigo lo recibió un sábado, lo retuvo dos o tres días y luego lo entregó a Torres Andino, cuando éste fué a buscarlo entre cuatro y cinco de la tarde. Torres

dijo que iba a buscar el carbón; que doña Amparo, la superintendente del hospital, le había dicho que fuera a buscarlo. El testigo le dijo a Torres: "Esto es para José María Valentín, entrégaselo a él." El testigo creía que esto ocurrió un martes entre ocho u ocho y media. Había recibido el cheque de Arsenio y no del Alcalde. No sabía qué había hecho Torres con el cheque. El testigo había hecho preparar los papeles porque el Alcalde le había pedido que tuviera el cheque listo cuando Valentín fuera a buscarlo. Entre siete y siete y media del día en que el testigo entregó el cheque ellos fueron donde él y le dijeron que viniera a recibir el carbón. El testigo se dirigió al Alcalde y éste le dijo que fuera a recibirlo. Cuando el testigo llegó ya se habían descargado 150 sacos. Había contado el resto. Había 200 sacos pequeños. El testigo los había contado. El testigo identificó la cruz en el recibo como hecha por él en ausencia de Valentín porque Valentín lo había autorizado. Valentín había autorizado al testigo a firmar los documentos. El testigo no recordaba la fecha. Había ido a ver a Valentín sobre una transacción y Valentín le había dicho: "Puedes arreglar esos papeles." El testigo había entregado el cheque a Torres para evitarse dos viajes.

El Alcalde declaró: Que había hablado con Valentín el domingo 16 de enero y Valentín le había prometido traer el carbón la semana siguiente. Transcurrieron cinco días y Valentín no había vuelto. El sábado, el testigo tenía que salir de la ciudad, y las oficinas se cerraban a las cinco de la tarde. El testigo había informado al Auditor que tendría que irse a mediodía y le había pedido a éste que tuviera los libramientos listos. Los jíbaros vienen al pueblo el sábado. El testigo había firmado los papeles, salido de la ciudad y regresado el lunes. Valentín no había traído el carbón. El testigo entonces había pagado de su propio bolsillo $1.20 por el carbón usado el sábado, domingo, lunes y martes, porque Valentín no había traído el carbón. El declarante salió del pueblo el sábado a mediodía después de firmar los papeles. A su regreso le dijeron que el carbón no había llegado. El testigo había pagado de su propio peculio la suma de $1.20.

El carbón llegó el martes. En dicho día José Torres había llevado un muchachito al hospital y como había trabajado para el municipio, la superintendente le llamó la atención sobre el carbón. Entonces Torres había visto a Hernández, quien era uno de los porteros y a la vez listero. El testigo no vió cuando el carbón llegó, pero al ser preguntado supo que éste había llegado. El declarante fué informado más tarde sobre lo ocurrido con el cheque; no lo sabía al momento de ocurrir esto. Había convenido en pagar el precio del carbón al entregársele el mismo. Ordenó que prepararan la cuenta y el cheque porque iba a salir y si Valentín hubiera traído el carbón y el cheque no estaba listo él no lo hubiera dejado porque no quería dejarlo fiado. El cheque se había preparado el sábado. No se había preparado el lunes siguiente, porque ése era el principio de otra semana y el testigo no tenía ya ninguna obligación. A su regreso el testigo fué informado de que el carbón no había llegado y él se vió precisado a pagar de su propio bolsillo $1.20 de carbón.

Preguntado por qué después de saber el lunes que Valentín no había traído el carbón, no había buscado carbón en otra parte y no había cancelado la transacción que dió origen al cheque expedido a la orden de Valentín, el testigo contestó que él no había tenido ninguna intervención ulterior en esa transacción. Preguntado si no había sabido del viaje que se hizo con el cheque en busca del carbón, el testigo contestó que si sabía de eso era porque lo había sabido después. Preguntado si no le había interesado el no tener que continuar pagando carbón de su propio bolsillo, el testigo contestó que era cuestión de centavos y que a él le había interesado prestar algún servicio al hospital y el obtener el carbón por las razones antes explicadas, porque la zafra estaba próxima a empezar y habría un alza en precio. El testigo se había interesado en favor del municipio desde un punto de vista económico y creía que 26 centavos era un buen precio. Preguntado por qué no había averiguado a su regreso el lunes que el carbón no se había entregado, el testigo contestó que

él tenía múltiples ocupaciones y no iba a estar pendiente a esa pejiguera del carbón. El testigo había sabido más tarde de la llegada del carbón el martes; no había recibido ningunas otras llamadas telefónicas ni se había visto precisado a gastar ningún dinero adicional. Al testigo se le dijo que el carbón llegó el martes en la tarde. Había considerado que la transacción quedó cerrada desde el momento en que el cheque fué expedido y se cerró el negocio con una persona aparentemente responsable. Preguntado si había estado presente en el momento en que Hernández firmó la factura, el testigo contestó que él nada tenía que ver con eso, y que ésas eran cuestiones del Auditor y del Tesorero.

Las oficinas municipales debían permanecer abiertas hasta el sábado a las cinco de la tarde. Hernández hubiera tenido poca dificultad en hallar al tesorero y al auditor después de horas de oficina si Valentín hubiera llegado ya entrada la tarde y se hubiese negado a entregar el carbón antes de recibir el cheque. Parece haber habido poca razón para creer que él llegaría con el carbón después de las cinco de la tarde o que si llegaba después de esa hora habría regresado a Vega Baja con el mismo antes de aceptar la entrega del cheque en la mañana del lunes como pago en efectivo. Sea ello como fuere, no había necesidad de falsificar su marca en la factura por temor a que llegara tarde o por cualquier otra causa.

Orestes Ramos había cambiado el cheque de Valentín en San Juan el lunes 24 de enero. Por tanto, el viaje con el cheque desde Manatí a Vega Baja el martes 25 de enero, fué obra de la imaginación. Los detalles de la supuesta conversación entre Torres Andino y Orestes Ramos en la tarde del martes 25 de enero, eran igualmente ficticios, primero, porque Torres no tenía el cheque para aquel entonces, y, segundo, porque Orestes mismo había cambiado el cheque el día antes. Así, pues, la cuestión relativa al momento preciso y a la forma exacta en que el cheque vino a poder de Orestes, se convierte en algo especulativo. Asumiendo que Torres y Cabrera hubieran recibido el carbón de Orestes poco antes de entre-

garlo en Manatí, ellos debieron haberlo recibido entrada la tarde o al oscurecer del martes 25 de enero. No es probable que Orestes recibiera el cheque mientras el Alcalde estaba fuera de la ciudad, a no ser que él lo recibiera del propio Alcalde o con el conocimiento y consentimiento de éste. La conclusión alternativa es que él debió haberlo recibido en algún momento en la mañana del lunes, luego de haber regresado el Alcalde a su oficina y con el conocimiento y consentimiento de éste.

Orestes tenía tres fincas cerca de Manatí. Declaró en la repregunta:

Que él y su hermano siempre se habían llevado bien; su hermano le había hablado sobre algunas de sus dificultades administrativas. No siempre hablaban sobre estas cuestiones. A veces al encontrarse, lo hacían. El hermano no sabía lo que el testigo hacía en su finca, porque el testigo nunca hablaba con nadie sobre sus negocios. El testigo no había dicho a su hermano que él fabricaba carbón vegetal porque eso no le importaba a él.

Orestes, según su propia declaración, y según las declaraciones de otras personas en relación con otros cargos, había venido en ayuda del Alcalde por lo menos en dos ocasiones anteriores. Si el Alcalde sabía que podía obtenerse el carbón de Orestes, también debió haber sabido que su problema podría resolverse mediante una palabra de él a Orestes. Éste, según parece, fabricaba carbón en grandes cantidades en la finca Gandía, bastante cerca de Manatí. Lo almacenaba en la esperanza de obtener mejor precio una vez que empezara la cosecha. La zafra de 1938 debía empezar en febrero. En la época en que se celebraba la vista en agosto, tenía en existencia tres mil sacos. Declaró en relación con otros cargos que él y su hermano vivían en la misma casa. Manatí es un pueblo pequeño. Si Orestes le había dicho o no al Alcalde en enero que él fabricaba carbón, la posibilidad de que el Alcalde desconociera ese hecho parece bastante remota.

Valentín era un comerciante ambulante. Negociaba en carbón vegetal. Según la versión que el Alcalde hizo de la

transacción con Valentín, éste le informó que Howe vendía carbón en sacos grandes a razón de setenta y cinco centavos el saco. El Alcalde le ofreció sesenta y cinco centavos por saco. Valentín parece haber tenido poco interés en el asunto, pero finalmente convino en comprarle el carbón a Howe, de ser posible, al precio ofrecido por el Alcalde. Valentín probablemente sabía que Orestes tenía carbón a la venta, aunque el Alcalde no lo supiera, y él no tenía interés en ocultar ese hecho al Alcalde.

Cuando se inició la investigación en marzo, el Alcalde se confrontaba con una condición, y no con una teoría. La cuenta de Valentín—certificada y aprobada por el Alcalde con el recibo falso, y el cheque de Valentín con su endoso falsificado y con el endoso adicional de Orestes—exigía una explicación. No había razón alguna para que el Alcalde no comprara el carbón a Orestes una vez que Valentín dejó de cumplir su compromiso. A no ser por el cheque de Valentín con su endoso falso, no hubiera habido necesidad de una cortina de humo (*smoke screen.*) Toda la historia relacionada con el entendido entre el Alcalde y Valentín puede o no haber sido fabricada como lo dicho acerca del viaje a Vega Baja.

Conforme se indica en la declaración del Alcalde, éste no tenía obligación alguna de aceptar de Valentín la entrega del carbón después del sábado 22 de enero. Por razones que también se desprenden de su declaración, él deseaba obtener el carbón sin más demora. Orestes estuvo en San Juan antes de cerrar el banco el lunes 24 de enero. Si recibió el cheque en Manatí, debió haberlo recibido antes del mediodía del lunes, o alrededor de esa hora, a pesar de que el carbón no fué entregado hasta el oscurecer del martes o entrada la tarde de ese día. La inferencia es que la transacción había quedado cerrada en el momento en que él recibió el cheque. De lo contrario no lo hubiera recibido. El carbón fué comprado a Orestes y pagado con el cheque de Valentín. No hallamos base satisfactoria para la teoría de que fué comprado y pagado sin el conocimiento o consentimiento del Alcalde.

Hubo prueba tendente a demostrar que los documentos correspondientes a una transacción que se celebraba de contado con Valentín, pudieron ser cancelados y nuevos documentos preparados, incluyendo un cheque a favor de Orestes Ramos, en media hora. El Alcalde sabía que había certificado la cuenta como correcta, legal y como debida a Valentín. Sabía que había aprobado el pago de la cuenta. Sabía que no había certificado o aprobado la cuenta de Orestes Ramos. Sabía o debió haber sabido, que Valentín no había entregado el carbón. Sabía, o debió haber determinado, el hecho de que Valentín no había endosado el cheque. La forma en que el cheque de Valentín fué utilizado en pago del carbón adquirido de Orestes Ramos, revela una infracción de las formalidades usuales y de los métodos ordinarios de llevar los negocios del municipio que no puede ser ignorada. Decimos esto porque la actitud del Alcalde hacia esta irregularidad puede considerarse como un factor en relación con la cuestión relativa a la importancia que debe dársele a otras irregularidades similares.

El carbón no le fué entregado al hospital sino al Alcalde, o por lo menos fué depositado en un almacén cuyas llaves él guardaba.

Para la época en que se celebró la vista el tesorero municipal no había expedido cheques para la compra de carbón con posterioridad al cheque de Valentín. Esto pudo deberse al hecho de que la existencia que se decía haberse comprado sin el conocimiento o consentimiento del Alcalde en enero, no se había agotado, o pudo haberse debido al hecho de que se había iniciado una investigación en marzo.

Nadie, a excepción de Torres, estaba dispuesto a asumir responsabilidades por el endoso falsificado. Ni el Alcalde ni Hernández ni nadie más con autoridad, parecía estar dispuesto a respaldar el viaje a Vega Baja. Ni el Alcalde, ni su brazo derecho, Hernández, podían admitir tener conocimiento del endoso y entrega del cheque de Valentín sin aceptar cierta responsabilidad por semejante endoso y entrega,

complicándose· así aun más, en una transacción irregular y dudosa en extremo. De ahí la tentativa infructuosa de establecer un endoso y una entrega no autorizados por parte de Torres después de cambiarse el cheque por Orestes. El fracaso rotundo de esa tentativa deja la cuestión relativa a por qué y por quién se hicieron el endoso y la entrega sumidos en el misterio. La teoría de una venta al municipio sin conocimiento o consentimiento del Alcalde ni de ningún otro funcionario o empleado municipal, descansa por completo en el hecho de que Orestes recibió el cheque de Valentín, y lo cambió, unido al hecho, de ser tal hecho, de que más de 24 horas después, éste entregó al Alcalde sin el conocimiento o consentimiento anteriores de dicho Alcalde, doscientos sacos de carbón.

Empero, para los fines de esta opinión, puede admitirse, sin resolverlo, que el séptimo cargo—excepto en tanto en cuanto el mismo se refiere a la responsabilidad del Alcalde por haber preparado y presentado la factura de Valentín y por las consecuencias que surgieron—no fué establecido mediante una preponderancia clara de la prueba.

El cargo octavo fué que el Alcalde durante los meses de julio, agosto y septiembre, 1937, había utilizado un camión G.M.C. de su pertenencia, pero haciéndolo pasar como propiedad de su pariente Jesús Ramos Robles, para hacer la limpieza municipal, y había recibido por tales servicios $276.

El noveno cargo fué que el Alcalde durante los meses últimamente mencionados, con intención de defraudar al Pueblo de Puerto Rico, había utilizado una tablilla municipal en el camión antes descrito.

El décimo cargo fué que el Alcalde durante los meses de octubre y noviembre, 1937, había usado dicho camión, como perteneciente a su hermano Orestes Ramos, en la limpieza municipal, y había recibido por tales servicios la suma de $171.

Es un hecho incontrovertido que el camión había tenido tablillas pertenecientes al municipio. Sin embargo, a menos que el Alcalde fuera dueño del camión, el hecho de que tuviera

tablillas del municipio difícilmente justificaría su remoción del cargo.

Desde fines del año 1933 el camión había estado a nombre de Jesús Ramos. Éste no era su dueño. La cuestión a resolver era si el camión pertenecía al Alcalde o a Orestes. La prueba hubiera sostenido la conclusión de que pertenecía al Alcalde. No embargante, la Asamblea Municipal no llegó a esa conclusión y, luego de un cuidadoso examen de la prueba, no estamos dispuestos a alterar ese resultado.

Los cargos 11 al 55, inclusive, fueron substancialmente al efecto de que el Alcalde había certificado, aprobado y presentado al Auditor Municipal ciertas nóminas con los nombres de personas que no habían prestado los servicios que el municipio les pagaba. Las personas que así figuraban en las nóminas municipales eran: Gerardo Carrión; José Rodríguez, conocido también por Julio Enrique Rodríguez; Ceferino Medina y Gerardo Montano.

Gerardo Montano vivía en una finca que pasó a poder de Orestes Ramos. Continuó viviendo en esa propiedad durante nueve o diez meses. Estuvo allí desde julio 1937 hasta abril de 1938. Tuvo que mudarse cuando chapodearon los plátanos, unas tres semanas antes de comparecer como testigo en·la vista del procedimiento de *impeachment*. El declarante era un peón bajo las órdenes de Gerardo Carrión en la finca de Orestes Ramos. Carrión era el mayordomo. El testigo ordeñaba las vacas de Virgilio Ramos. El municipio le pagaba, el tesorero municipal Carreras. Durante los meses de julio de 1937 a marzo·de 1938, José Rodríguez vivía en el cercado del Alcalde, en una habitación contigua al establo. Trabajaba allí. Trabajaba para el Alcalde. Él fué con el testigo al municipio y Carreras le pagó. Ceferino Medina vivía en "el pueblito Rojo" en terrenos que el hermano del Alcalde adquirió y regaló a los pobres. Trabajaba para el Alcalde, picando pasto durante la época que el testigo estuvo allí. Él también era pagado ·por el municipio. En la repregunta el testigo manifestó que no· había dicho que trabajaba para Ores-

tes Ramos, sino que vivía allí; que había vivido nueve meses en la finca de Orestes Ramos, hasta que Orestes Ramos se presentó y le dijo al declarante que iba a chapodear los plátanos. El testigo nunca trabajó para el municipio. El Alcalde le había dicho que su deber era ordeñar las vacas por las mañanas y luego venir al municipio "a pasar pañito allí y cuando vea malas y no buenas debía venir a ordeñarle las vacas." Que el testigo iba a las oficinas menos de un cuarto de hora para que el público viera que él iba allí. El testigo "pasó el pañito—eso nada más." No recordaba si había ocho o nueve vacas. Ceferino Medina, Julio Enrique y el testigo trabajaban allí. Gerardo Carrión trabajaba para Orestes Ramos en la finca de éste.

Julio Molina declaró que Gerardo Montano, Ceferino Medina y José Rodríguez trabajaban en la lechería del Alcalde. Había cinco o seis vacas. Montano picaba la yerba.

Cornelio Escudero estuvo a cargo de la limpieza pública desde que comenzó la administración de Ramos hasta el 6 de diciembre de 1937. Gerardo Carrión no trabajó con el testigo en ningún momento durante dicha época. El testigo entregaba personalmente al auditor una relación de los peones a fines de cada semana. Gerardo Carrión no trabajó de enero a diciembre de 1937. El testigo a veces lo veía en la finca de Orestes Ramos. El declarante no sabía dónde trabajaba Gerardo Montano. Tampoco sabía dónde trabajaba José Rodríguez. Éste no trabajaba con el testigo.

En la repregunta el declarante manifestó que todos los viernes en la tarde él entregaba al auditor una relación de los peones que trabajaban con él. Esta relación se hacía oralmente, basándose el testigo en las constancias en su poder. Mientras el testigo se dirigía a su trabajo entre ocho y ocho y media vió a Gerardo Carrión varias veces en la finca de Orestes por espacio de tres o cuatro meses. El declarante estaba a cargo de cinco peones y del chófer del camión. También era márshal de la corte de paz.

Gonzalo Córdova Chirino declaró que Escudero estuvo a cargo de la limpieza pública desde enero 11 hasta fines de noviembre de 1937. De enero a junio Escudero informaba al testigo los nombres de los empleados dedicados a la limpieza pública. En julio el Alcalde nombró a Eduardo Hernández, quien desde entonces llevaba la lista de los empleados tal cual lo hacía Escudero. No incluyó el nombre de Carrión. Llevaron al testigo la libreta de jornales y entonces él fué donde Escudero o donde Hernández para cotejar la información que el testigo tenía del Alcalde, sentado en el escritorio del Alcalde. Se incluían nombres y el Alcalde les decía: "Tengo a éste en esto." El Alcalde dió instrucciones de que se incluyeran a José Rodríguez y a Gerardo Montano. Ceferino Medina estaba en la lista por haber trabajado en el municipio. En otras ocasiones el Alcalde había dado órdenes de que se le incluyera.

En la repregunta el testigo manifestó que Ceferino Medina había trabajado en el municipio; los otros también, según la información que el testigo tenía. Había visto a Gerardo Montano durante las mañanas haciendo la limpieza. Había visto a Ceferino Medina trabajando en las calles. Por un tiempo José Rodríguez trabajó en el hospital. No había visto a Gerardo Carrión trabajando en el pueblo. Había muchas reclamaciones de jornales de trabajadores y el Alcalde le decía: "Quítale medio día a éste; esta mañana llovió; no se pudo hacer la limpieza; ese *truck* no trabajó; a ese *truck* no, él trabajó en esto; quítenle dos días a éste y pónganle a éste dos días." Eduardo Hernández estuvo encargado de la libreta de jornales desde el primero de julio, era el listero.

Gerardo Carrión como testigo de la defensa declaró:

Que vivía en su propia finca, la que lindaba con la de Orestes Ramos. Había trabajado unos ocho meses para el municipio en el trabajo que se hacía en las calles y en otras obras públicas. El municipio le había pagado. Había trabajado de julio, 1937, a marzo, 1938. Después que terminó su trabajo con el municipio trabajó por su propia cuenta aten-

diendo sus propios intereses. El testigo tenía algunas reses en un cercado que estaba en la finca de Orestes Ramos. Iba allí en las mañanas que tenía tiempo. Tenía por costumbre levantarse a las cinco de la mañana y cuando tenía tiempo iba a ver su ganado antes de presentarse al alcalde. También hacía esto a mediodía y después de las cuatro de la tarde. Trabajaba en el municipio a veces desde las ocho hasta las cinco; en otras ocasiones desde las 7 hasta las 4 de la tarde. Mientras recibía sueldo del municipio no trabajaba para ningún otro patrono. El sueldo pagado por el municipio al testigo lo era por los servicios prestados por él.

En la repregunta este testigo declaró:

Que había trabajado esos ocho meses como inspector de las obras municipales que se hacían en las carreteras. Había habido veces en que el testigo no había trabajado la semana entera, mas había trabajado todas las semanas. El primer trabajo que se le asignó fué atender a cierto trabajo que se hacía en la carretera de Tierras Nuevas. El trabajo había durado unas tres semanas. Se habían cavado zanjas. Se hizo un alcantarillado; se rellenaron algunos huecos en la carretera. El testigo inspeccionaba el trabajo y a veces, cuando tenía tiempo, también trabajaba. Elpidio Durán estaba a cargo del trabajo. Eduardo Hernández era el listero. El testigo no le pagaba a Orestes Ramos nada por el pasto. El municipio le pagaba un dólar al día cuando trabajaba. El trabajo en Tierras Nuevas duró unos tres meses. Luego de eso se reparó otro trozo de carretera en Coto Sur. El trabajo se prolongó unos dos meses. En ocasiones el alcalde mandaba al testigo a ciertas diligencias. Luego estuvo unos dos meses trabajando en La Bajura, rebajando el camino. Elpidio Durán estaba a cargo del trabajo. Después el testigo trabajó en el corral del hospital y reparó una cornisa del edificio del hospital. Elpidio Durán estuvo a cargo del trabajo. El testigo no estaba bajo sus órdenes, sino que el alcalde lo mandó a inspeccionar el trabajo.

Virgilio Ramos Muñiz declaró:

Que Gerardo Carrión había trabajado para el municipio desde el 3 de julio de 1937 hasta el 18 de marzo de 1938. Se le había pagado de distintas asignaciones porque había ocupado distintos cargos como auxiliar del alcalde. Con frecuencia el testigo había necesitado un hombre honrado en quien poder confiar la investigación de ciertas cuestiones en interés del servicio público. A Carrión se le había pagado de la asignación a que correspondía la mayor parte de los servicios prestados por él. De las nóminas podía aparecer que a Carrión se le había pagado por cierto trabajo mientras se dedicaba a otra cosa, debido a que durante la mayor parte de la semana él había estado ocupado en la forma indicada en la nómina. En tales casos se cargaban los servicios a la asignación a que correspondía la mayor parte del trabajo hecho. Carrión trabajó en la carretera de las Boquillas, en la construcción de un puente, así como en la inspección del puente, a fin de que el concreto no desapareciera, de que la piedra entregada era la que se necesitaba—un hombre que le aligerara el trabajo, que pudiera hacer inspecciones e informarle. Carrión trabajó igualmente en la carretera del Próspero, en el corral, en la verja del matadero, en la cornisa del hospital, en el cercado, en la cuesta del río. Se le mandaba a investigar supuestas enfermedades. El testigo no utilizó a otros empleados porque no había dinero con qué pagarles.

En la repregunta este testigo declaró:

El puente a que se refería era una alcantarilla. Carrión trabajaba como capataz y al mismo tiempo como peón en el trabajo de las carreteras. Elpidio Durán era la persona responsable del trabajo y al mismo tiempo trabajaba como peón. El testigo a veces mandaba a Carrión a investigar si la limpieza pública se había hecho en debida forma. Carrión también trabajó en el corte que se le dió a las aceras y en la reparación de las calles. Puede que apareciera en una nómina como haciendo trabajo de limpieza de oficinas cuando las otras nóminas estaban agotadas. Él trabajó en

todo lo que se necesitara. Cuando las nóminas dicen ''ser-
vicios del alcalde'' el auditor puede explicar eso mejor que
el testigo.

José Rodríguez declaró:

Que había trabajado para el municipio desde julio a marzo.
Mientras estaba empleado con el municipio no trabajaba para
ninguna otra persona. Su trabajo consistía en levantarse
temprano y cuando se cansaba en montarse en el caballo del
alcalde, inspeccionar el trabajo hecho por los barrenderos e
informarle. También era su deber darle cuerda al reloj dos
veces por semana. Había trabajado dos horas, dos horas y
media o tres horas por la mañana conforme fuera necesario,
y por las tardes; después le había dado cuerda al reloj los
martes y los jueves, viernes o sábados. A él le correspondía
hacer esto dos veces por semana.

En la repregunta el testigo declaró:

Que trabajaba de dos a tres horas por la mañana y se
le acreditaba medio día; puede que se le acreditara todo el
día; no le apuntaban más de medio día o cuando no tres
octavos de día. Si se echaba tres o cuatro horas se le acre-
ditaba medio día. Para darle cuerda al reloj se necesita
media hora. A veces el testigo tenía que medir la profun-
didad del agua en los tanques del acueducto.

Virgilio Ramos Muñiz declaró:

Que Rodríguez había estado empleado con el municipio
por espacio de diez meses. Su trabajo consistía en darle
cuerda al reloj y en ver si el trabajo hecho por los barren-
deros durante la noche era o no eficiente. Por la noche venía
el camión de la basura y entonces Rodríguez tenía que voltear
el pueblo para ver si toda la basura había sido recogida.
Por lo general se le pagaba de la partida del alcalde, como
ayudante suyo.

En la repregunta declaró:

Que el presupuesto no contenía asignación alguna para un
relojero. Era el deber de Rodríguez enterarse por la mañana

de si los barrenderos habían cumplido con sus deberes y por la tarde ver si se había recogido la basura de los *zafacones*.

Ceferino Medina declaró:

Que mientras estuvo empleado con el municipio como barrendero no había trabajado para ninguna otra persona. Trabajó para el alcalde durante varios meses, pero no continuamente, chapodeando, poniendo espeques y ordeñando vacas. Cuando el testigo trabajaba en el establo del alcalde se le pagaba en el establecimiento de éste. Cuando ponía espeques y ordeñaba las vacas del alcalde no le pagaba el municipio. Mientras el municipio le pagaba el testigo trabajaba como barrendero. En una ocasión el testigo trabajó para el alcalde seis días o una semana en febrero y marzo. Había trabajado quince días para el alcalde; una semana de seis días, otra semana de seis días y otra de tres días en distintos meses durante el año 1938.

Repreguntado el testigo manifestó:

Que había trabajado desde las siete hasta las cuatro como barrendero; nunca trabajó de noche. Trabajó sólo en un sitio llamado "El Ensanche." No había trabajado en ningún otro sitio. El testigo era responsable al alcalde mas no a ninguna otra persona. Había un listero cuyo nombre el testigo no recuerda. El listero había visto al testigo trabajar y había tomado nota de ello. No era José Rodríguez. Nunca había visto a José Rodríguez inspeccionando la limpieza pública. No había visto a Gerardo Carrión trabajar como listero ni como inspector de la limpieza. No recordaba quién era el listero, al cual él era responsable. Estaba seguro de que no era Gerardo Carrión ni José Rodríguez. El listero andaba a pie. Había trabajado como barrendero un número de semanas.

En el examen redirecto declaró:

Que el Ensanche estaba al saliente. El testigo no trabajó en el pueblo; un listero llamado Eduardo tomaba nota del trabajo que el testigo hacía; no sabía quién tomaba nota en otras zonas del municipio. Se mantenía dentro de su propia

zona. No sabía quién trabajaba ni quién inspeccionaba el trabajo en otros sitios.

Al ser nuevamente repreguntado declaró:

Que no sabía si el inspector era Eduardo Hernández; le parecía que había sido Eduardo Hernández.

Virgilio Ramos Muñiz dijo:

Que Ceferino Medina fué asignado a un distrito especial, en una parte del Ensanche. Él había trabajado desde el 12 al 18 de febrero, seis días, cuatro días con el municipio y tres días con el testigo en un cercado que estaba en una propiedad perteneciente al testigo, en un sitio llamado Polvorín. Por el trabajo hecho con el testigo a Medina se le pagaba en la tienda; por los servicios prestados al municipio se le pagaba en el municipio; durante el resto del mes trabajaba para el municipio. En el mes de marzo Medina trabajó seis días con el testigo y el resto del mes para el municipio a razón de un dólar por día, encargado de una parte del Ensanche. Por el trabajo hecho con el testigo a Medina se le pagó en el establecimiento. Medina trabajó para el municipio todo el mes de abril, menos seis días, durante los cuales ordeñó las vacas y por lo cual se le pagó en la tienda. Por los servicios prestados al municipio se le pagó en el municipio. En mayo, junio y julio Medina trabajó para el municipio.

En la repregunta este testigo declaró:

Que Tito Martínez inspeccionaba el trabajo hecho por Medina en el Ensanche. José Rodríguez y Tito Martínez no trabajaban al mismo tiempo. Mientras trabajaba Gerardo Carrión el otro no estaba allí.

Eduardo Hernández declaró:

Que había sido listero y que Medina y Rodríguez trabajaban para el municipio. El testigo había visto a José Rodríguez a veces; en algunas ocasiones iba en busca de la llave del reloj; le daba cuerda al reloj y luego el testigo lo veía inspeccionando los camiones utilizados en la limpieza pública. El testigo le preguntó qué hacía y él le contestó que trabajando. Gerardo Carrión trabajó para el municipio. El tes-

tigo le vió a veces trabajando como inspector. Cuando faltaba piedra o cualquier otra cosa el testigo tomaba nota de ello. Gerardo Montano trabajó para el municipio; limpiaba las paredes, y lavaba las escaleras; también pasaba paño a los escritorios; todos los empleados le vieron. El testigo había anotado los nombres de Gerardo Montano, José Rodríguez, Ceferino Medina y Gerardo Carrión como empleados del municipio. Gerardo Montano, según recordaba el testigo, había empezado a trabajar en julio de 1937 y había trabajado cuatro o cinco meses.

En la repregunta manifestó:

Que había guardado una relación de los empleados municipales. Al principio Cornelio Escudero estaba a cargo de la basura y él había tomado nota de los nombres de los peones que se dedicaban a la limpieza pública. José Rodríguez le daba cuerda al reloj; inspeccionaba los *drums* y los pintaba; hacía lo que el alcalde le ordenaba. Cuando el testigo veía a Gerardo Carrión trabajando, tomaba nota de ello; a veces Carrión se quejaba de que el testigo no lo hubiese anotado. A veces el testigo le pedía al capataz encargado del trabajo en la carretera que le suministrara una relación de nombres. El testigo se levantaba a las siete y tomaba nota de las personas que estaban trabajando. Mientras Cornelio Escudero estuvo a cargo de la limpieza pública llevaba una relación de los peones que se dedicaban a ese trabajo. El testigo anotó el nombre de Gerardo Carrión cuando empezó a trabajar en julio de 1937. No recuerda si anotó a Gerardo Carrión para la semana del 3 al 9 de julio de 1937. Tampoco recuerda si anotó a José Rodríguez para la semana de julio 10 al 16. Cornelio Escudero era el listero del trabajo de limpieza. Cuando Escudero se fué el testigo se hizo cargo de ese trabajo. El declarante no anotó a Cornelio Escudero como empleado municipal. No podía decir que Gerardo Carrión y José Rodríguez hubieran estado empleados en la limpieza pública porque Escudero era el que estaba a cargo de eso.

Tampoco podía decir si durante la semana del 10 al 16 de julio, José Rodríguez había trabajado en la limpieza pública.

En el examen redirecto manifestó:

Que Gerardo Montano trabajó dos o tres semanas a principios de 1938.

Arsenio Carreras declaró:

Que a fines de febrero o marzo Gerardo Montano había ido todas las mañanas a limpiar las oficinas—durante la mayor parte de marzo.

En la repregunta este testigo dijo:

Que no sabía lo que Gerardo Montano hacía después de las ocho y media de la mañana.

Zoilo Cardona Rodríguez, el conserje, declaró:

Que trabajaba de seis a seis. Gerardo Montano trabajó desde el 25 ó 26 de enero hasta el 4 ó 5 de marzo de 1938, haciendo la limpieza de las oficinas, de los inodoros y del salón de la asamblea municipal. Trabajaba de siete a doce y de una a cuatro.

En la repregunta dijo:

Que en adición a sus deberes como conserje también era portero en la oficina del alcalde. Montano era ayudante suyo; limpiaba las oficinas entre siete y nueve y media y después se ponía a las órdenes del testigo. Montano llevaba las cartas al correo.

Virgilio Ramos Muñiz declaró:

Que Montano había trabajado 24 días en la limpieza del edificio. Trabajaba ocho horas al día. El testigo lo despidió. Montano no trabajaba en ningún otro sitio mientras recibía sueldo del municipio.

En la repregunta manifestó:

Montano nunca había trabajado para el declarante. Por referencia el testigo sabía que Montano había vivido en la finca de Orestes Ramos.

La prueba aducida en apoyo de los cargos 11 al 55, inclusives, estableció un caso prima facie. La de la defensa deja mucho que desear. Orestes Ramos, dueño de la finca donde

Carrión tenía su ganado, no fué llamado como testigo. El propio Carrión declaró que sólo se le pagaba $1 al día por los servicios que prestara al municipio y que él tenía el ganado en la finca de Orestes Ramos. No pagaba nada por pastar el ganado. En ausencia de una explicación respecto a por qué se le permitió que tuviera sus reses en la finca de Ramos, sin pagar por ese privilegio, su negativa del hecho probable de que estaba empleado con Ramos no nos inspira confianza. Rodríguez, Medina y Montano mientras eran pagados por el municipio pudieron haber estado o no empleados por el Alcalde, según se alega en algunos de los cargos. Los cuatro fueron puestos en las nóminas por el Alcalde o por orden suya. La mayoría de ellos parece disponían de mucho tiempo que podían dedicar al cumplimiento de alguna labor provechosa. Sus deberes como empleados municipales no eran arduos.

Medina había trabajado tanto para el Alcalde como para el municipio. Mientras trabajaba para el municipio se le asignaba a un distrito especial. Aparentemente tenía un listero especial para que viera el trabajo que él hacía. Según la declaración de Medina, él respondía tan sólo al Alcalde y no sabía el nombre del listero, si es que había alguno. El Alcalde declaró que Tito Martínez vigilaba el trabajo de Medina. Tito Martínez no fué llamado como testigo ni fué identificado como listero ni como empleado del municipio por ninguno de los testigos a excepción del Alcalde.

José Rodríguez—por lo menos cuando estaba cansado— parece haber cumplido sus obligaciones a caballo. Montaba el caballo del Alcalde. Se le pagaba de la asignación del Alcalde como ayudante suyo. Su trabajo consistía en levantarse temprano, inspeccionar el trabajo que hacían los barrenderos y en informarle al Alcalde. Dos veces por semana le daba cuerda al reloj. A veces medía la profundidad del agua en los tanques del acueducto.

Los deberes principales de Montano eran limpiar las oficinas, los inodoros y el salón de sesiones. Limpiaba las ofi-

cinas entre siete y nueve y media. No se demostró el número ni el tamaño de los inodoros ni el tiempo que se requería para limpiarlos. Con qué frecuencia limpiaba el salón de sesiones tampoco aparece de los autos. También había llevado la correspondencia al correo.

Desde julio de 1937 hasta marzo de 1938, según su declaración, Carrión había estado empleado por el municipio como inspector del trabajo que el municipio hacía en los caminos públicos. Primeramente había inspeccionado el trabajo que se hizo en la carretera de Tierras Nuevas. El trabajo duró unos tres meses. Luego, por espacio de dos meses, inspeccionó el trabajo efectuado en Coto Sur. Más tarde pasó algunos meses en el trabajo que se hizo en La Bajura, rebajando la cuesta. De las nóminas municipales que se ofrecieron como prueba aparecía que durante los meses de julio, agosto y septiembre de 1937 no se repararon ningunas carreteras. De la misma prueba documental se desprendía el hecho de que desde el primero de julio de 1937 hasta el 30 de junio de 1938 sólo se habían dedicado 60 días a ese trabajo.

Ni Carrión ni el Alcalde explicaron exactamente qué trabajo se hizo en el cercado, en la cornisa del hospital o en otras obras pequeñas, ni cuánto tiempo se requirió para hacer el trabajo. Según recordamos, sólo un caso específico de los investigados por Carrión fué admitido al hospital. El auditor municipal era también el secretario confidencial del Alcalde. Podría ser, conforme sugiere el Alcalde, que el auditor hubiera podido explicar mejor que él mismo el alcance de los libramientos por los gastos incurridos en "servicios del Alcalde". La declaración del Auditor como testigo del Alcalde habla por sí misma.

El Alcalde parece haber tenido muchos ayudantes. El auditor municipal, Eduardo Hernández, José Rodríguez y Gerardo Carrión contribuían todos a aliviar su labor. Zoilo Cardona Rodríguez, el conserje, era otro que le servía de ayudante en adición a sus deberes como portero. El mismo

Cardona tenía un ayudante que hacía el poco trabajo que el conserje a no ser por tal ayuda hubiese tenido que realizar como tal conserje.

Según dice el Alcalde en su declaración, él no empleó un número mayor de ayudantes únicamente porque no había dinero con qué pagarles.

Conforme repetidamente dice el Alcalde en su declaración sobre otros cargos, la situación económica del municipio era deplorable. La situación difícil en que se colocó al Alcalde sin duda impresionó bastante favorablemente a la Asamblea Municipal. También nos ha impresionado a nosotros. Sin embargo, esa impresión hubiera sido mayor si el Alcalde hubiese sido más conservador en el desembolso de los fondos municipales al crear canonjías para por lo menos dos o tres empleados municipales cuyos deberes oficiales podían ser efectuados por uno solo de ellos. Éste es un elemento importante en la atmósfera general del caso.

Podría fácilmente decirse que Carrión, Rodríguez, Medina y Montano no prestaron los servicios por los cuales les pagaba el municipio y que la Asamblea Municipal cometió error al no llegar a tal conclusión. Sería aún más fácil decir que el Alcalde se había apropiado para su propio uso de parte por lo menos de los fondos recaudados para la compra de mangas y bocas de riego para incendio (no obstante el pago tardío, si es que hubo tal pago, de las cuentas de Vigo y Montes) y que la Asamblea Municipal cometió error al no llegar a tal conclusión. Toda vez que el Alcalde ha sido exonerado de estos cargos por la Asamblea Municipal—y puesto que la destitución de un funcionario público por conducta oficial impropia, especialmente por conducta que envuelve depravación moral, es un asunto serio—preferimos basar nuestra decisión en otros fundamentos.

El cargo 56 fué substancialmente que el Alcalde había certificado y aprobado cierta nómina correspondiente a los meses de julio primero a octubre 15, 1937, y presentado la misma al auditor municipal, quien expidió su libramiento al tesorero

municipal, para el pago de $35 a Francisca Haw, como empleada del hospital municipal; que el Alcalde sabía que Francisca Haw no había prestado servicios por los $35 consignados en la nómina; que a virtud de dicho certificado el tesorero municipal entregó al Alcalde $35, de los cuales éste pagó a Francisca Haw $9 solamente y se apropió el saldo de $26.

Francisca Haw declaró: que era una enfermera auxiliar, no una enfermera graduada. Había trabajado en el hospital de Manatí. No recordaba dónde había trabajado en junio y julio del año anterior, pero en abril o julio había trabajado en el hospital municipal de Manatí. No recordaba cuánto tiempo había trabajado, pero le parecía que había sido un mes y días. Había recibido $10 por su trabajo. No había suscrito el documento que se le mostraba.

En la repregunta manifestó: que su hermana Victoria Haw también había estado empleada como enfermera. Victoria había trabajado como año y medio. Las firmas que se le mostraban a la testigo eran las de Victoria. Ella había firmado por la testigo. La declarante había autorizado a Victoria para que firmara por ella.

Arsenio Carreras, tesorero municipal, había pagado los $35 a una enfermera llamada Miss Haw en la oficina del Alcalde. No los había entregado personalmente al Alcalde. Ella estaba cerca de la mesa y el testigo los había puesto sobre la mesa, donde ella hablaba con el Alcalde—el escritorio del Alcalde. El testigo no sabía lo que ella había hecho con ellos. El Alcalde había aprobado la nómina. El testigo no había pagado nada a Francisca Haw, la persona cuyo nombre aparecía en la nómina. No estaba seguro de haber entregado los $35. Los había puesto sobre la mesa donde estaba la niña esa.

En la repregunta manifestó: que había tomado los $35 con el propósito de entregarlos a la niña esa, quien los esperaba, y que los puso al lado de ella. El testigo sabía que eran para ella y fué ella quien había firmado y cobrado. Los

había contado y puesto en presencia de ella. No sabía quién había preparado la nómina. El auditor la había entregado al testigo con el libramiento de pago en favor de Miss Haw y el testigo le pagó a ella. (Aquí el testigo identifica su propia firma y la del Alcalde.)

En el examen redirecto: el testigo identificó el libramiento núm. 486, que incluía tres libramientos distintos, uno por $35, por salarios, otro por $19.50, por salarios, y el tercero por $37.75. El libramiento incluía el comprobante por $35. El testigo identificó un cheque de $35, núm. 17,786, como correspondiente al libramiento.

Repreguntado nuevamente, el testigo manifestó: que no había hecho ningún otro pago a la señorita Haw o a su hermana por el mismo período cubierto por el cheque. No sabía si la señorita Haw había trabajado en el hospital durante aquel tiempo, toda vez que él no había estado en el hospital.

En un nuevo examen redirecto, el testigo manifestó: que nada tenía que ver con el hospital. El Alcalde era el Director de Beneficencia.

Gonzalo Córdova Chirino, auditor municipal, declaró como testigo de la defensa: Victoria Haw y Francisca Haw habían trabajado en el hospital. El testigo las había visto con frecuencia. Eran enfermeras. El municipio les pagaba. El último pago se le hizo a Victoria en abril o mayo, cuando ella dejó de trabajar para el municipio. Victoria Haw estuvo empleada desde enero de 1937 hasta abril o mayo del mismo año a razón de $15 mensuales—de enero 11 a junio 30. En el nuevo año fiscal se le fijaba un sueldo de $20 mensuales. Esas sumas se le pagaban a Victoria Haw. El último pago se efectuó mediante un libramiento corriente a favor de Victoria Haw, para el mes durante el cual se prestaron los servicios. A Victoria Haw se le adeudaban $35. El testigo no podía especificar la deuda. Había empezado a trabajar en enero. No había fondos para pagarle. No se le había pagado del presupuesto de aquel año. La deuda continuaba pendiente.

En la repregunta dijo: que Victoria Haw había trabajado el primero de julio de 1937. Había continuado trabajando sin interrupción hasta mayo de 1938. Había habido un libramiento de $35 para julio. Se le había pagado a fines de cada mes. Francisca había empezado a trabajar el primero de julio. Según los libramientos, había trabajado hasta el 15 de octubre. Desde julio 1, 1937, a octubre 15 del mismo año ambas hermanas habían trabajado y se les había pagado. El testigo las había visto con frecuencia. El conocimiento que tenía lo había obtenido de las nóminas. Las nóminas eran el producto de la información recibida por él. No sabía si Francisca había trabajado de julio a octubre de 1937; pero según la nómina ambas habían trabajado al mismo tiempo.

En el examen redirecto: el libramiento expedido a Francisca Haw no era por una suma adeudada a ella. A Victoria se le debía desde enero 11 hasta junio 30 de 1937, deuda que ascendía a unos $90 y que no pudo ser pagada durante ese año. Ella había seguido trabajando mes tras mes y se le pagaban $35 mensuales en el nuevo presupuesto, y más tarde se le adeudaba un saldo de $35. Entonces se le dijo al testigo que preparara un libramiento a la Haw por la suma de $35, que era el saldo adeudádole. El libramiento se hizo a Francisca Haw por los tres meses y medio que correspondían a Francisca.

Al ser repreguntado de nuevo, el testigo manifestó: que se le dabían más o menos $80 a Victoria Haw del presupuesto de 1936-1937. No figuraba en los libros porque el testigo no había hecho libramientos durante ese período. Ella había trabajado en el hospital y las nóminas iban a los libros solamente al tiempo de efectuarse el pago. Ella había trabajado cinco meses y medio a $15 mensuales, según la información dada al testigo por el Alcalde. Como esto no se había pagado, el libramiento se hizo a Francisca Haw por $35 por 2⅓ meses a razón de $15. Todos los libramientos hechos a Victoria Haw desde julio 1, 1937, habían incluído una suma adicional en pago de la deuda anterior. Su sueldo era $20 y

se le pagaban $35—$15 adicionales a cuenta de la deuda anterior. Esto ocurrió solamente en julio y agosto. Estuvo ausente seis días del mes de septiembre. Se le pagaron $35 en julio: $20 de sueldo y $15 a cuenta de la deuda anterior. Se le pagaron $35 en agosto: $20 de sueldo y $15 adicionales. En septiembre se le pagaron $16.65, descontándosele los primeros seis días del mes y sin que se incluyera suma alguna a cuenta de la deuda anterior. No sabía por qué los $15 adicionales a cuenta de la deuda anterior no se pagaban en septiembre. El pago de $35, en vez de $20, se hizo de conformidad con un entendido entre el testigo y el Alcalde. El testigo sabía que su sueldo era $20 y le pagaba a razón de $35 a cuenta de la deuda anterior. En octubre se le pagaron $20. Victoria Haw continuó trabajando hasta mayo de 1938. Desde octubre 1937 hasta el 10 de mayo 1938 se le pagó a razón de $20 mensuales, sin incluirse suma adicional alguna a cuenta de la deuda anterior. Durante ese tiempo se le pagaron en total $30 a cuenta de la deuda de 1936–1937. La deuda ascendía a $82.50. Se le adeudaba un saldo de $52.50, o sea la diferencia entre $82.50 y $30. El total del libramiento de Francisca Haw por $35 fué pagado a Victoria Haw. A Francisca Haw se le pagó mediante otros libramientos por los servicios prestados por ella. El testigo había pagado los $35 como saldo del balance adeudado. Ella no había reclamado los $17.50. Se había ido del municipio. El testigo no sabía por qué no se siguió la práctica de incluir la suma adicional de $15 en el pago mensual que se le hacía a Victoria Haw; tal vez el testigo consideró que no era una cosa propia seguir haciendo eso. Cuando el testigo se enteró de que el libramiento de Francisca Haw se hizo para pagar a su hermana Victoria Haw, ya el libramiento se había preparado y pagado. El tesorero lo había pagado. El testigo lo había preparado. El testigo supo después que los $35 debían pagarse a Victoria Haw. El declarante supo esto mediante la investigación que se practicó. El testigo había preparado un libramiento a favor de Victoria y se le dijo:

"El trabajo que se le debe a la Haw, pues Francisca." El libramiento fué preparado para Francisca. Entonces el testigo se enteró de que se trataba del saldo de la cuenta de Victoria. Al testigo se le reclamaron unos haberes que tenía la Haw en el hospital. Le dijeron la Haw. Los sueldos de Victoria Haw para los meses de julio, agosto, septiembre y octubre aparecían como pagados. El testigo había preparado el libramiento y preguntado si también su hermana trabajaba. Después de preparar el libramiento (el declarante no sabía si el tesorero lo había pagado o no) el testigo se había enterado que se trataba del saldo de la cuenta de Victoria Haw. El testigo no sabía si el tesorero había pagado o no. El declarante lo llamaba pagado porque ya él había extendido el libramiento; pero no sabía si el tesorero le había cogido la firma de ella y lo había pagado. Las nóminas pueden estar pendientes de pago sin nadie cobrarlas. El testigo había dicho pagada porque ya él había extendido el libramiento. Cuando el testigo preparaba la nómina y expedía el libramiento, creía que el dinero era para Francisca en pago de servicios prestados en el hospital. Francisca Haw trabajaba en el hospital; el testigo no sabía cuánto tiempo. El libramiento de Francisca Haw no era en pago de los servicios prestados por Francisca Haw. Había un libramiento por los servicios prestados por Francisca Haw. Era un libramiento de $10. Julio 1 a julio 4, a $1 por día, $4, y julio 5 a julio 11, a $1 por día, $6. Eso fué cuanto se le pagó a Francisca Haw. Además del libramiento a que se hace referencia en el *exhibit* 18, eso fué todo lo que se le pagó a Francisca Haw. El testigo creía que Francisca Haw trabajó en el hospital por espacio de un mes. Comprendía sus servicios durante el mes. Si un empleado gana $10 mensuales, lo menos que el municipio puede pagar es $1; diez días $10; eso es cuanto se le ha pagado a ella; es decir, si ella hubiera trabajado un mes y no hubiese recibido más de eso, entonces habría trabajado a razón de $10 mensuales. Las dos nóminas certificadas por el declarante por servicios prestados por Francisca

Haw desde julio 1 a julio 4, 1937, y desde julio 5 a julio 11, 1937, pagándosele dos veces por los mismos servicios, pudieron ser un error en la preparación del libramiento.

El testigo había expedido el libramiento para el pago de la nómina núm. 39. Había preparado la nómina de los $35 de conformidad con instrucciones recibidas del Director de Beneficencia, del Alcalde. El testigo no recuerda si el Alcalde le había dicho que el dinero era para Victoria Haw y que se le adeudaba del presupuesto anterior. El declarante se había enterado de ello por mediación de la misma Victoria, luego de expedir el libramiento y de entregar al tesorero todos los documentos necesarios para el pago. El testigo le preguntó: "¿Qué tú vas a hacer con tus chavos?", y ella le contestó: "No, ya yo los cobré." La primera información recibida por el testigo fué a través de Victoria; porque ella iba a embarcarse. El testigo había hablado con el Alcalde y éste le dijo que era cierto. Respecto al conocimiento personal de que el testigo había hablado en el examen directo, el testigo dijo que había obtenido esta información de Victoria y del Alcalde después de efectuarse la transacción. El testigo había considerado esa información, una vez recibida, como cosa de su conocimiento personal. Que un testigo puede hacer una cosa ahora y no saber que la está haciendo y sin embargo por hechos posteriores, por información que tenga después, puede llegar a la conclusión de que lo que estaba haciendo estaba mal hecho.

En un nuevo examen redirecto este testigo declaró: Victoria Haw ganaba $15 mensuales; de julio 11 a julio 31 había 20 días a razón de cincuenta centavos el día, o sea $10. En febrero, marzo, abril, mayo y junio a $15 mensuales—enero $10, febrero $15, etc.—el total ascendería a $85, no a $82.50. Se le pagaron $35 en el mes de julio. No recordaba si Victoria Haw había trabajado en el hospital durante el mes de julio. Se le pagaron $35. A fines del año 1936–1937, el municipio adeudaba dinero a Victoria Haw por los servicios prestados por ella como enfermera del hospital municipal.

Al tiempo en que se veía el procedimiento de *impeachment* ella no reclamaba nada del municipio. Dijo que le habían pagado.

Al ser nuevamente repreguntado, el testigo manifestó: que no recordaba si Victoria había trabajado en julio de 1937. Según los libramientos, ella había trabajado en julio, agosto y septiembre. Según las nóminas, ella había trabajado de enero 11, 1937, a mayo 10, 1938. Había un libramiento para septiembre que indicaba una ausencia de seis días. El testigo no recordaba si ella había trabajado en julio, como tampoco recordaba si había trabajado en julio, agosto y septiembre.

El Doctor R. Rodríguez Buxó declaró:

Que Victoria Haw trabajó de enero 11, 1937 a mayo 10, 1938. Había habido algunos períodos de vacaciones. No recordaba si éstos habían ocurrido en julio o agosto, 1937. Había habido unas cuatro semanas de vacaciones en julio o agosto. Se le había pagado por todos los meses después de julio. Había estado ausente a veces de dos a cinco días. Había un período más largo en julio o agosto de 1937, unas cuatro semanas. No recordaba si ella había tomado algunas vacaciones en septiembre. Ella había empezado a trabajar a razón de $15 mensuales—de enero a junio. En julio, por recomendación del testigo, el sueldo de ella fué aumentado a $20 mensuales.

Repreguntado el testigo, contestó:

Los empleados del hospital, incluyendo a Victoria Haw, fueron nombrados por el Director Municipal de Beneficencia, Virgilio Ramos Muñiz.

En el examen redirecto dijo:

Las enfermeras a veces le cogían dinero prestado al testigo y al Alcalde. El testigo no les cobraba intereses.

Virgilio Ramos Muñiz declaró:

Francisca Haw había estado empleada en el hospital municipal unos 32 ó 33 días como enfermera auxiliar a razón de $10 mensuales. Ella empezó a trabajar el 1 de julio de 1937. No regresó al trabajo después del mes de julio. Victoria Haw había trabajado desde enero 11, 1937, como enfermera auxi-

liar en el hospital municipal por un sueldo de $15 mensuales. La asignación para los sueldos del hospital municipal, con excepción del sueldo del médico, estaba agotada. El sueldo de Victoria Haw y otros se habían pagado haciendo préstamos de dinero, y de su propio bolsillo. De lo contrario el hospital no hubiera podido permanecer abierto. Lo mismo sucedía con las comidas. El testigo tenía que recaudar dinero para poder mantener el hospital abierto. El médico del hospital tenía que prestarle dinero a las enfermeras de su propio salario, sin esperanzas de que se lo devolvieran. No era cuestión de administración sino de lucha para sostener el hospital abierto. Durante esos cinco meses veinte días el testigo había prestado dinero a Victoria Haw y a otros de los fondos del Partido, sin importarle lo que pudiera ocurrir. El testigo tenía que mantener el hospital abierto y no importa lo que costara lo sostuvo abierto. Había enviado un número de telegramas al Auditor, pero no había recibido respuesta. No tenía amigos a excepción de aquéllos a quienes pedía dinero para el sostenimiento del hospital. Si el declarante no hubiera adelantado dinero a las enfermeras, éstas se hubiesen ido del hospital. Se adeudaban $85 a Victoria Haw al cerrar el presupuesto del año fiscal. No había Asamblea Municipal. El testigo había visitado al Auditor un número de veces. Reuniendo el Territorial del Partido de un momento a otro se fueron 18 meses. No había Asamblea Municipal. El Auditor de Puerto Rico preparó un presupuesto idéntico al del año anterior. En esas condiciones, no se confeccionan deudas para pagarle a las personas que se les adeuda. Ahí entonces fué que se salieron del reglamento. El testigo estima que los reglamentos existen cuando hay fondos. Cuando no hay fondos en el municipio, no tiene nada, qué va a reglamentarse. En julio el médico del hospital recomendó que a Victoria Haw se le diera un sueldo de $20, pero ella había estado trabajando cinco meses veinte días y después unas vacaciones que se tomó. Se le pagó el mes de julio sin trabajarlo; pero los $35 se le debían a cuenta de la deuda ascen-

dente a $85. En los meses posteriores se le pagó a razón de $20 mensuales, más una suma adicional a cuenta de los $85 que se le debían del presupuesto anterior. En julio se le pagaron $35 sin haber trabajado. En agosto ella recibió $35, veinte como sueldo de dicho mes y quince a cuenta de los $85 adeudádosle. En septiembre se le pagaron $16.65 en vez de $20, porque había tomado seis días de vacaciones. Ese pago (refiriéndose a un libramiento no identificado) calculado desde julio a octubre 15, era a cuenta de la deuda que se había contraído de enero 11 a junio 30. Preguntado si la suma que se adeudaba a Victoria Haw había quedado liquidada con el pago a Francisca Haw, el testigo contestó: "$35 y $35, $70, y $15 que se le dieron en el mes de agosto, son $85." Los $35 a que se hace referencia en el *exhibit* 18 en vez de ser de Francisca eran de Victoria. El tesorero un cheque que cambie tiene que firmar como dice el cheque; y una nómina tiene que decir lo que diga la nómina para poderla pagar. Había dos señoritas Haw; era un nombre algo raro; el nombre de pila nunca se mencionaba, sino el apellido, pues siempre eran Miss Haw; de ahí la equivocación. Debió expedirse a favor de Victoria en vez de a Francisca, a fin de que los $35 figuraran como pertenecientes a Victoria, a quien correspondían, quien era dueña de los mismos y quien los cobró, y quien también tenía autoridad para venir a firmar por su hermana. Esa joven vió al auditor y la nómina correspondiente ha sido preparada con un montón de disparates —con cuartos de días y octavos de días, día por día y las horas extras a como dice el Gobierno. Entonces tendríamos que tener $300,000 de presupuesto. Esta combinación de días se prepara para que aparezca trabajando todos los días, en intervalos. Entonces debería decir desde julio 1 hasta septiembre 19, $35; que eso era de Victoria y nunca de Francisca y a Victoria era que se le debían. Victoria firmó la nómina. En tanto esa nómina se hacía, Victoria fué a la oficina del Alcalde y se sentó a esperar que terminaran, porque eso tarda muchísimo. Cuando hubo terminado, salió y

firmó. Al momentito vino el tesorero y le contó $35 en el mismo escritorio donde estaba el testigo, en el lado donde estaba sentada ella. Victoria recibió los $35. Esa misma tarde ella hizo reponer dinero que del Partido se le había facilitado; y por su propia voluntad pagó $26 que ella había tomado de los fondos del Partido. El testigo contó ese pago y lo puso en el sitio donde debía estar ese dinero; en los sobres correspondientes. Victoria Haw y Francisca Haw eran hermanas. Victoria firmó por Francisca, y se hizo ella de ese dinero que le correspondía, que no era de Francisca.

En la repregunta el testigo dice:

El declarante tenía las cartas en que Victoria Haw le pedía dinero prestado. El dinero así solicitado ascendía en total a $26. En septiembre se le pagó a Victoria su sueldo de $20 solamente, porque en aquel entonces la nómina se hizo por $35 a nombre de Francisca. El testigo era Alcalde; el auditor era quien llevaba las cuentas. En octubre se pagaron $20 a Victoria por sus servicios; nada a cuenta de la deuda anterior. La nómina de $35 en vez de tener el nombre de Francisca debió tener el de Victoria Haw. El testigo dice que eso era una equivocación, porque Francisca nada tenía allí. Lo que ella había trabajado lo había cobrado. El testigo tenía secretario. La cuestión relativa a si una nómina separada por $20 a nombre de Victoria podía incluirse en una sola nómina de $55, era cuestión discrecional de él; eso era una irregularidad proveniente de las grandes irregularidades que vienen sucediendo a virtud de El Pueblo de Puerto Rico no haber atendido un pueblo con la asamblea desde su principio. La intención fué hacer la nómina a favor de Victoria Haw; bien sabía el testigo que Francisca nada tenía allí. Francisca nada tenía allí. Ella había trabajado 35 días. Se le pagaron. ''La nómina de acuerdo con el sistema del gobierno tenía puesta a razón de días y aparece con diez días de junio primero al 4 y de julio 5 al 11, que suman diez, a peso hacen $10.'' Lo legal de acuerdo con estos números es de julio primero a julio 30. La nómina fué suscrita

por el Director de Beneficencia el 31 de julio, por el testigo en persona. El nombre de Francisca en la nómina de $35 para octubre había sido un error; debió ser Victoria. El testigo no había notado el nombre. Con referencia a las dos nóminas para el mismo mes, una por $20 y la otra por $35, el testigo creyó que toda vez que la deuda ascendía a $85, Victoria se había ganado el dinero irrespectivamente de a quién se le pagaba. Los $35 eran para Victoria y a Victoria se los firmó. Sabía que aún se adeudaban los $35 a Victoria, mas no había notado que la nómina figuraba a nombre de Francisca. Sabía que el papel estaba lleno de números; la numeración de siempre. Victoria estuvo empleada en el municipio hasta el 10 de mayo de 1938. En los meses en que no se le abonó nada, el municipio disponía de poco dinero para hacer erogaciones que podían dejarse para más tarde. Le pagaron en julio $35; en agosto volvieron a darle $35, pero solamente eran $15. En septiembre no hubo dinero para pagarle los $15. Los cheques del testigo se retrasaban quince o veinte días después de todo el mundo cobrar, para darle oportunidad a que los demás cobraran. La escasez de fondos era una de las razones; el Auditor puede que supiera de otras.

Comentarios más extensos parecen ser superfluos. La única equivocación fué un relato falso hecho deliberadamente. El Alcalde sabía lo que estaba haciendo. Había circunstancias atenuantes. Se puede aceptar que el dinero se le debía a Victoria Haw y que en cuanto a los $26, el Alcalde estaba simplemente cobrando lo que él le había prestado a Victoria anteriormente. Se puede aceptar que no había depravación moral envuelta.

No puede haber duda razonable de que el Alcalde certificó y aprobó las nóminas de Francisca Haw teniendo conocimiento de que Francisca Haw no había prestado los servicios en cuestión. No puede haber duda razonable de que el Alcalde no depositó en tesorería municipal el dinero recaudado para la compra de mangas de fuego y reparación de bocas de

riego. Estas irregularidades no se pueden separar de las circunstancias que las rodean ni considerarse como hechos aislados. Hay que considerarlas a la luz de todas las circunstancias. Sobresaliendo de toda la evidencia del caso, nos dejan tan sólo un camino a seguir.

En vista de la anterior conclusión, la primera de las dos cuestiones discutidas extensamente en los alegatos resulta académica. Esa cuestión, levantada por el primer señalamiento, era si la Asamblea Municipal erró al exonerar al Alcalde basándose en que los cargos no se habían probado fuera de duda razonable. La segunda es si la conclusión de una Asamblea Municipal es equivalente al veredicto de un jurado y por lo tanto obligatoria para este tribunal.

Puede que exista alguna analogía entre el veredicto de un jurado y el fallo de una Asamblea Municipal en un procedimiento de residencia. Si la hay, la analogía no es muy estrecha. Sería suficiente decir que hay una diferencia amplia y claramente importante entre la manera en que se constituye una Asamblea Municipal y la forma en que se constituye un jurado. No es menester que discutamos los conocidos detalles que les distinguen. Puede admitirse, sin resolverlo, que la decisión de una Asamblea Municipal no debe revocarse en ausencia de pasión, prejuicio y error manifiesto en la apreciación de la prueba. No estamos dispuestos a ir más lejos.

*La decisión de la Asamblea Municipal debe ser revocada y, debido a las irregularidades envueltas en el cargo 56 y en los primeros seis cargos, se ordena la destitución del Alcalde.*

El Juez Asociado Sr. Travieso no intervino.